UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
JESSE QUARTARARO, KEVIN KERESZTES,
JOHN BARCLAY, and MICHAEL OPINSKI,

                     Plaintiffs,

     -against-                            Case No.:  17-cv-7390 (RRM)(ARL)

J. KINGS FOOD SERVICE PROFESSIONALS, INC.
and JOHN KING,

                     Defendants.
------------------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**PUTNEY, TWOMBLY, HALL & HIRSON LLP**
521 Fifth Avenue
New York, New York 10175
(212) 682-0020
*Attorneys for Defendants, J. Kings Food Service*
*Professionals, Inc. and John King*

Of Counsel:
    James E. McGrath, III
    Rebecca K. Kimura

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................... 1

STATEMENT OF FACTS ........................................................................................... 2

    A.    The Parties ..................................................................................................... 2

    B.    Plaintiffs' Employment ................................................................................ 3

    C.    Out of State Deliveries Constitute a Significant Percentage of Trips and
        Revenue for J. Kings ..................................................................................... 4

    D.    Drivers Are Assigned Routes Based on the Business Needs of J. Kings ........ 4

    E.    J. Kings Requires That Drivers Satisfy Commercial Motor Carrier
        Requirements ................................................................................................. 7

    F.    The USDOT and FMCSA Have Exerted Jurisdiction Over J. Kings'
        Operations ..................................................................................................... 9

ARGUMENT ............................................................................................................ 10

POINT I    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT
              BECAUSE THERE ARE NO GENUINE DISPUTES AS TO ANY
              MATERIAL FACTS ................................................................................. 10

POINT II    PLAINTIFFS' CLAIMS FOR OVERTIME VIOLATIONS UNDER THE
             FLSA FAIL BECAUSE THEY ARE EXEMPT UNDER THE MOTOR
             CARRIER ACT ........................................................................................ 11

    A.    J. Kings Is a Motor Carrier Engaged In Interstate Commerce ....................... 12

    B.    Plaintiffs' Activities Fall Within the Motor Carrier Act Exemption .............. 12

POINT III    PLAINTIFFS' CLAIMS FOR OVERTIME VIOLATIONS UNDER THE
           NYLL ARE LIKEWISE MERITLESS ................................................... 17

POINT IV    PLAINTIFFS CANNOT SUCCED ON THEIR WAGE NOTICE CLAIM
           UNDER NYLL 195(1) .............................................................................. 18

POINT V    PLAINTIFFS CANNOT SUCCED ON THEIR CLAIM FOR VIOLATION
            OF NYLL 195(3) ..................................................................................... 19

POINT VI    BARCLAY AND OPINSKI'S CLAIMS FOR RETALIATION UNDER
           THE NYLL ARE MERITLESS ................................................................ 20

    A.    Barclay Fails to State a Claim of Retaliation ................................................ 21

    B.    Opinski Fails to State a Claim of Retaliation ................................................ 22

    C.    Opinski's Retaliation Claim Is Time-Barred ................................................ 23

CONCLUSION ......................................................................................................... 24

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ahmed v. Morgans Hotel Grp. Mgmt., LLC*,
  54 Misc. 3d 1220(A), 55 N.Y.S.3d 691 (N.Y. Sup. Ct. 2017)................................19

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)................................................................10

*Bilyou v. Dutchess Beer Distributors, Inc.*,
  300 F.3d 217 (2d Cir. 2002)......................................................14, 17

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)................................................................10

*Chaohui Tang v. Wing Keung Enters.*,
  210 F.Supp.3d 376 (E.D.N.Y. 2016) ...............................................12

*Clarke v. JPMorgan Chase Bank, N.A.*,
  No. 08 CIV. 2400..................................................................17

*Crawford v. Coram Fire Dist.*,
  No. 12 CV 3850, 2014 WL 1686203 (E.D.N.Y. Apr. 29, 2014)...........................20

*Dauphin v. Chestnut Ridge Transp., Inc.*,
  544 F.Supp.2d 266 (S.D.N.Y. 2008)................................................15

*Dejesus v. HF Mgmt. Servs., LLC*,
  726 F.3d 85 (2d Cir. 2013)........................................................11

*Encino Motorcars, LLC v. Navarro*,
  138 S. Ct. 1134 (2018)...........................................................13, 17

*Flood v. Just Energy Marketing Corp.*,
  904 F.3d 219 (2d Cir. 2018)......................................................13

*Fox v. Commonwealth Worldwide Chauffeured Transp. of NY, LLC*,
  2012 WL 1078230 (E.D.N.Y. Mar.30, 2012) ........................................17

*Fox v. Commonwealth Worldwide Chauffeured Transp. of NY, LLC*,
  865 F. Supp. 2d 257 (E.D.N.Y. 2012) .............................................9, 17

*Gamero v. Koodo Sushi Corp.*,
  272 F. Supp. 3d 481 (S.D.N.Y. 2017), aff'd, 752 F. App'x 33 (2d Cir. 2018)........18

*Grella v. St. Francis Hosp.*,
149 A.D.3d 1046 (2d Dep't 2017) ...................................................................20

*Higueros v. New York State Catholic Health Plan, Inc.*,
526 F. Supp. 2d 342 (E.D.N.Y. 2007) .............................................................20

*JihuiZhang v. XYZ Limousine, Inc.*,
No. 15-CV-7440 (JS) (AKT), 2019 WL 1220310 (E.D.N.Y. Mar. 15, 2019) .......................13

*Levinson v. Spector Motor Service*,
330 U.S. 649 (1947) ........................................................................................13

*Martin v. Sprint United Mgmt. Co.*,
2017 WL 5028621 (S.D.N.Y. Oct. 31, 2017) ...................................................19

*Masson v. Ecolab, Inc.*,
2005 WL 2000133 (S.D.N.Y. Aug.17, 2005) ...................................................16

*Mayer v. Neurological Surgery, P.C.*,
2016 WL 347329 (E.D.N.Y. Jan. 28, 2016) ..............................................20, 21

*McDonnell Douglas Corp. v. Green*,
411 U.S. 792 (1972) ........................................................................................20

*Mohammed v. Start Treatment & Recovery Centers, Inc.*,
64 Misc. 3d 1, 95 N.Y.S.3d 711 (N.Y. App. Term. 2019)................................20

*Morris v. McComb*,
332 U.S. 422 (1947)........................................................................13, 14, 15, 16

*Munoz-Gonzalez v. D.L.C. Limousine Serv.*,
904 F.3d 208 (2d Cir. 2018)......................................................................13, 16

*Pierre v. Hajar, Inc.*,
No., 2018 WL 2393158 (E.D.N.Y. Mar. 28, 2018) ..........................................18

*Pyramid Motor Freight Corp. v. Ispass*,
330 U.S. 695 (1947)...............................................................................12, 13, 14

*Resch v. Krapf's Coaches, Inc.*,
785 F.3d 869 (2015).........................................................................................15

*Salahuddin v. Goord*,
467 F.3d 263 (2d Cir. 2006)............................................................................10

*Southland Gasoline Co. v. Bayley*,
319 U.S. 44 (1943).............................................................................................13

**Statutes**

29 U.S.C. § 207(a)(1) ........................................................................................................11

49 U.S.C. § 322(a ..............................................................................................................7

49 U.S.C. § 13102(15) .....................................................................................................12

49 U.S.C. § 31502 ............................................................................................................11

49 USC § 113 ................................................................................................................2, 9

Fair Labor Standards Act ........................................................................................1, 11, 17

Federal Medical Leave Act ..............................................................................................22

Federal Motor Carrier Act .......................................................................................... *passim*

New York Labor Law ................................................................................................. *passim*

**Other Authorities**

49 C.F.R. Part 40 .........................................................................................................7, 8

49 C.F.R. §§ 365.105, 365.106T ....................................................................................12

49 C.F.R. §390.1, § 391.1 ..................................................................................................8

49 C.F.R. § 390.5 ............................................................................................................14

49 C.F.R. § 391.23(d) and (e) ............................................................................................7

49 C.F.R. § 391.27 ............................................................................................................7

49 C.F.R. § 391.41-391.49 .................................................................................................8

49 C.F.R. § 392.42 and 383.33 ..........................................................................................7

49 C.F.R. § 395.8(a) ..........................................................................................................9

Federal Rules of Civil Procedure Rule 56 ...............................................................1, 2, 10

## PRELIMINARY STATEMENT

This Memorandum of Law is submitted by Defendants, J. Kings Food Service Professionals, Inc. ("J. Kings") and John King ("King") (hereinafter collectively, "Defendants"), by and through their attorneys, Putney, Twombly, Hall & Hirson LLP, in support of their motion pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment dismissing the Complaint of Plaintiffs Jesse Quartararo ("Quartararo"), Kevin Keresztes ("Keresztes"), John Barclay ("Barclay") and Michael Opinski ("Opinski") (collectively "Plaintiffs"), in its entirety.

Plaintiffs, truck drivers for J. Kings, claim they worked more than 40 hours per week, but were not provided overtime compensation. Plaintiffs assert four causes of action: (1) failure to pay overtime compensation for all hours worked in excess of 40 per workweek in violation of the Fair Labor Standards Act ("FLSA"); (2) failure to pay overtime compensation for all hours worked in excess of 40 per workweek in violation of New York Labor Law ("NYLL"); (3) failure to provide proper wage notices, in violation of NYLL § 195(1); and (4) failure to provide accurate wage statements, in violation of NYLL § 195(3). In addition, two of the Plaintiffs -- Barclay and Opinski -- claim they were retaliated against for taking medical leave, in violation of the New York Labor Law.

Plaintiffs cannot prevail on their wage claims because they are exempt from the FLSA's overtime requirements pursuant to the Federal Motor Carrier Act ("MCA") exemption and, likewise, from the overtime requirements in the NYLL. Moreover, Plaintiffs' wage notice claim under NYLL § 195(1) is meritless because Plaintiffs were hired prior to the law's effective date, therefore they have no right of action. Nor can Plaintiffs succeed on their claim for record-keeping violations under NYLL § 195(3), as they received proper and complete wage statements. As for Plaintiffs Barclay and Opinski's retaliation claims under NYLL, they fail as a matter of law because there is no evidence they ever made a complaint to Defendants of a Labor Law violation, or that the termination of their employment was caused by such complaint. Accordingly, Plaintiffs' claims cannot succeed on any of

the causes of action alleged in their Complaint.  Summary judgment should therefore be granted in favor of Defendants.

## STATEMENT OF FACTS[1]

### A.    The Parties

Defendant J. Kings, a New York company with its principal office in Holtsville, New York, is a commercial distributor of high quality foods.  (King Aff. ¶ 2)  J. Kings serves customers in the Tri-State area, as well as in twenty other states.  (King Aff. ¶ 2)  During the relevant time period,[2] J. Kings was a motor carrier registered with the Federal Motor Carrier Safety Administration[3] ("FMCSA").  (Ferraro Aff. ¶ 16)  Defendant John King is the founder, Chief Executive Officer and Chief Customer Officer of J. Kings.  (King Aff. ¶ 1)

Plaintiffs Quartararo, Keresztes,[4] Barclay and Opinski were employed as Drivers for J. Kings. (Ferraro Aff. ¶¶ 3, 5, Exs. 1-5; King Aff. ¶ 7)  As drivers, Plaintiffs drove trucks weighing over 10,001 pounds to make deliveries of food items to J. Kings' customers.  (Ferraro Aff. ¶ 18; Buscemi Aff. ¶ 7; Sandford Aff. ¶ 9)  Although Plaintiffs allege they were "ambassadors," there is no such position at J. Kings.  (Ferraro Aff. ¶ 5; King Aff. ¶ 7)  Rather, the term refers to a particular level of customer

---

[1] The undisputed material facts are fully set forth in the accompanying Local Rule 56.1 Statement.  For the Court's convenience, a brief statement of the facts is set forth herein.  For a complete recitation of the facts, the Court is respectfully referred to the Affidavit of John King ("King Aff."), the Affidavit of Greg Ferraro ("Ferraro Aff."), the Affidavit of Christopher Buscemi  ("Buscemi Aff."), the Affidavit of Robert Sandford ("Sandford Aff."), the Declaration of James E. McGrath, III, Esq. ("McGrath Decl."), and relevant deposition testimony. As used herein, "Quartararo. Depo. Tr." refers to the deposition of Plaintiff Jesse Quartararo; "Keresztes Depo. Tr." refers to the deposition of Kevin Keresztes; "Barclay Depo. Tr." refers to the deposition of John Barclay; "Opinski Depo. Tr." refers to the deposition of Michael Opinski; "King Depo. Tr." refers to the deposition of John King; "Buscemi Depo. Tr." refers to the deposition of Christopher Buscemi; and "Sandford Depo. Tr." refers to the deposition of Robert Sandford.

[2] Pursuant to NYLL § 198(3), the relevant time period here would be December 19, 2011 to December 19, 2017.  Under the FLSA, the relevant time period would be December 19, 2015 to December 19, 2017.  For purposes of this motion only, the "relevant time period" refers to the period between December 19, 2011 and December 19, 2017.

[3] The FMCSA is the agency within the U.S. Department of Transportation ("USDOT") tasked to prevent commercial motor vehicle-related fatalities and injuries through ensuring safety in motor carrier operations. 49 USC § 113.

[4] Keresztes started as a driver helper for six months before working as a driving for J. Kings. (Keresztes Tr. 17:25-21:3)

service provided to J. Kings customers, known as "ambassador service."  (King Aff. ¶ 7)

**B.    Plaintiffs' Employment**

J. Kings maintained a policy of at-will employment.  (Ferraro Aff. ¶ 4) Plaintiffs each acknowledged that their employment with J. Kings was "at will."  (Ferraro Aff. ¶¶ 3, 4, Exs. 1-4)

While Plaintiffs each allege they worked on average six days per week, 60 hours per week. (Complaint ¶¶ 16, 52, 87, 128), their time records prove otherwise.  With the exception of Quartararo, Plaintiffs seldom worked more than five (5) days per week.  (Ferraro Aff. ¶¶ 6, 9, Exs. 6-9)  To the extent they worked more than five days per week, it was strictly on a voluntary basis, as Plaintiffs were not required to do so.  (Ferraro Aff. ¶ 6)  Moreover, prior to 2008, to the extent Plaintiffs worked more than forty (40) hours per week, J. Kings voluntarily paid them at a rate of 1.5 times their regular hourly rate, despite their being exempt from federal and state overtime laws.  (Ferraro Aff. ¶¶ 10, 12, Exs. 10-13; King Aff. ¶ 4) At that time, Plaintiffs' regular hourly rate ranged from approximately $14.50 to $19 per hour.  (Ferraro Aff. ¶¶ 10, 12, Exs. 10-13)

At some point around 2008, J. Kings restructured its pay plan for all drivers such that they no longer received an hourly wage, but were compensated instead by a daily rate.  (Ferraro Aff. ¶ 11; King Aff. ¶ 5)  The change in the pay plan resulted in greater weekly compensation for the drivers. (Ferraro Aff ¶ 11; Buscemi Aff. ¶ 12)  This type of pay plan is not only common in the industry, it was so well received that it attracted warehouse employees of J. Kings to become drivers for the company.  (King Aff. ¶ 5)  During the relevant time period, Plaintiffs were paid a daily rate of $240 to $256 per day.[5]  (Ferraro Aff. ¶ 12, Exs. 10-13)  Plaintiffs allege they were not paid properly for overtime work under the day rate. (Complaint ¶¶ 212, 226).

---

[5] Based on Plaintiffs' allegations that they worked six days a week for 60 hours per week, their daily wages converted to hourly wages of $24.00/hr. to $25.60/hr., which was well-above 1.5 times the minimum wage of $7.25-$9.00 during the relevant time period.

Opinski's last day of work at J. Kings was April 24, 2015.  (Opinski Depo. Tr. 9:2-9; Ferraro Aff. ¶ 15)  Quartararo's last day of work at J. Kings was July 11, 2016.  (Quartararo Depo. Tr. 153:6-19; Ferraro Aff. ¶ 15)  Keresztes' last day of work at J. Kings was July 29, 2016. (Keresztes' Depo. Tr. 9:19-23; Ferraro Aff. ¶ 15)  Barclay's last day of work at J. Kings was August 4, 2016.  (Barclay Depo. Tr. 138:3-8; Ferraro Aff. ¶ 15)

### C.    Out of State Deliveries Constitute a Significant Percentage of Trips and Revenue for J. Kings

J. Kings provides food items to customers located in the entire Tri-State area, as well as in 20 other states.  (Ferraro Aff. ¶ 17; King Aff. ¶ 2)  From 2011 to 2017, J. Kings had between $11.7 million to $22.3 million in out-of-state sales, representing approximately twelve percent (12%) of its total sales.  (Ferraro Aff. ¶ 19, Ex. 16)  Moreover, on average, 15.2% to 28% of J. Kings' daily delivery routes serviced customers outside of New York, and up to 37.5% each day.  (*Id.* ¶ 43, Ex. 31)

### D.    Drivers Are Assigned Routes Based on the Business Needs of J. Kings

Since prior to 2011, J. Kings used a route planning software program from Roadnet Technologies[6] to design delivery routes based on orders input into the system.  (Ferraro Aff. ¶ 37; Sandford Depo. Tr. 25:10-26:15; Sandford Aff. ¶ 3)  The orders would then be downloaded into the system each day, and the program would set up the delivery routes with stops in sequential order. (Sandford Depo. Tr. 25:10-26:15; Sandford Aff. ¶ 3).  However, adjustments were made to the routes to add or modify stops as orders came in or schedules changed.  (Sandford Depo. Tr. 26:4-15; Sandford Aff. ¶ 5; Buscemi Aff. ¶ 5)  Because the routing was done on a daily basis, depending on the delivery orders for the day, there were no fixed or set "routes" that were driven every day.  (Ferraro Aff. ¶ 40; Sandford Aff. ¶ 4)  The Roadnet program then generated a driver itinerary, listing the delivery stops

---

[6] Roadnet was acquired by Omnitracs in 2013, but continues to use the Roadnet name and provides the same general routing functions.  (Ferraro Aff. ¶ 37; Sandford Depo. Tr. 27:23-28:4; https://www.omnitracs.com/news/omnitracs-completes-acquisition-roadnet-technologies)

for the day, the address, the estimated arrival and departure times for each delivery, and any additional instructions for the driver.  (Sandford Aff. ¶ 3; Ferraro Aff. ¶ 38)

Moreover, because there were no set routes, J. Kings did not assign any specific route to any particular driver.  (Ferraro Aff. ¶ 40; Sandford Aff. ¶ 4; Buscemi Aff. ¶¶ 9, 10)  While J. Kings tried to accommodate its drivers and assigned them to delivery areas in which they prefer when possible, the routes and the drivers assigned to the routes were determined primarily based on the needs of the company for that particular day.  (Ferraro Aff. ¶ 41; Sandford Aff. ¶¶ 5, 6; Buscemi Aff. ¶ 9, 10)  For example, circumstances might have arisen whereby drivers were pulled to cover different routes than originally scheduled in order to meet customers' demands.  (Sandford Aff. ¶ 5)  A driver could at any time also have been called upon to pick up items from another location at the end of their route. (Sandford Aff. ¶ 5; Barclay Depo. Tr. 196:22-197:7)  Drivers could also be asked at any time to rescue another driver and complete their deliveries.  (Sandford Aff. ¶ 5)  In addition, routes were rearranged at any time due to the unavailability of a driver to complete a route due to illness, vacation, or any other reason.  (Buscemi Tr. 13:23-14:4; Sandford Aff. ¶ 5)  Drivers were not permitted to decline any route or assignment, and if they did so, it would be grounds for termination.  (Ferraro Aff. ¶ 42; Sandford Aff. ¶7; Quartararo Tr. 149:25-150:7)  As a result, each of the drivers for J. Kings could have been called upon at any time to drive outside New York.  (Ferraro Aff. ¶ 42; Sandford Aff. ¶¶ 5, 6)  Indeed, nearly 80% of all J. Kings drivers drove trucks out of state at some point during their employment.  (Ferraro Aff. ¶ 44, Ex. 32; Buscemi Aff. ¶ 13)

Once the delivery routes were created, a driver was assigned to each route, and a truck was assigned to the drivers.  (Ferraro Aff. ¶ 38; Sandford Aff. ¶ 8)  The Roadnet program then generated a driver itinerary, which was printed, and provided to the driver.[7]  (Ferraro Aff ¶ 38; Sandford Depo.

---

[7] J. Kings does not maintain the daily itineraries. (Ferraro Aff. ¶ 38)

Tr. 29:2-30:10; Sandford Aff. ¶ 10)  In addition to the itinerary, drivers also received a pallet map, driver manifest, driver invoices and a money sheet.[8]  (Ferraro Aff ¶ 39; Sandford Depo. Tr. 30:8-15; Sandford Aff. ¶ 10)  The manifest was the cover sheet, identifying the driver for the route, and the deliveries to be made that day, the order of the deliveries, and the amount invoiced to each customer. (Ferraro Aff. ¶ 39)  The driver invoices identified the customer, the delivery location, a description of the items to be delivered, the number of units, and the price.  (Ferraro Aff. ¶ 39)  Once the driver arrived at each delivery location, the driver was required to note on the invoice the vehicle refrigeration temperature at the time of delivery.  (Ferraro Aff. ¶ 39)

According to the driver manifests and invoices provided to Plaintiffs for their deliveries for J. Kings, Opinski was repeatedly asked to make deliveries to customers out of state during the relevant time period.  (Ferraro Aff. ¶ 48, Ex. 34)  Opinski admitted to making deliveries for J. Kings in Connecticut and New Jersey.  (Opinski Depo. Tr. 135:25-138:5, 152:1-7, 163:7-22, 182:3-17, 195:7-15, 196:25-198:22.)  Manifests and invoices similarly showed that Barclay was repeatedly asked to make deliveries to customers out of New York for J. Kings.  (Ferraro Aff. ¶¶ 38, 48, Exs. 30, 34) Barclay also admitted to driving J. Kings' trucks into New Jersey and through Connecticut to Massachusetts.  (Barclay Depo. Tr. 122:16-123:16, 194:15-195:9, 196:22-197:7, 197:17-198:3, 202:4-22, 206:14-206:25, 230:13-231:21)  Keresztes also admitted to driving to New Jersey for J. Kings at some point during his employment, and may have also driven to Connecticut.  (Keresztes Depo. Tr. 90:1-8.)  Although Quartararo could not recall making any deliveries out of state, he admitted he could not refuse to drive outside New York, if asked by J. Kings.  (Quartararo Depo. Tr. 140:18-25.)  In fact, if any of the drivers for J. Kings refused an assignment to drive anywhere, including out of state, they

---

[8] The pallet map was a diagram depicting how the truck was loaded with the items to be delivered.  (Ferraro Aff ¶ 39; (Sandford Depo. Tr. 31:15-24.)  The money sheet listed each stop and allowed the driver to note whether the customer paid on account, or with cash, or if there were any returns or deductions.  (Ferraro Aff ¶ 39; Sandford Depo. Tr. 30:24-31:10)

could be terminated.  (Ferraro Aff ¶ 42; King Depo. Tr. 111:4-12, 113:13-114:11)

    **E.    J. Kings Requires That Drivers Satisfy Commercial
           Motor Carrier Requirements**

J. Kings is a commercial motor carrier, which is regulated by the FMCSA.  (Ferraro Aff. ¶ 16)

Thus, J. Kings requires that all drivers, including Plaintiffs, satisfy certain requirements as mandated

by the FMCSA regulations.[9]  (Ferraro Aff. ¶ 23)

Among other things, in their employment applications for the position of "driver" with J.

Kings, Plaintiffs were required to list any accidents and/or traffic convictions they had in the past 3

years, and were notified that an investigation and inquiries would be made into their personal

information, employment, financial and/or medical history, "for the purpose of investigating [their]

safety performance history as required by 49 C.F.R. Section 391.23(d) and (e)."  (Ferraro Aff. ¶23,

Ex. 1-4)

Moreover, as a part of their continued employment, Plaintiffs were required to obtain various

certifications in order to comply with the Federal Motor Carrier Safety Regulations of the U.S.

Department of Transportation ("DOT").  (Ferraro Aff. ¶ 24)  As proof of compliance with the FMCSR,

Plaintiffs were required to sign and/or complete the following documents (Ferraro Aff. ¶¶ 25-33):

- *Certificate of Compliance with Driver License Requirements*, as required by 49 C.F.R. Sections 392.42 and 383.33 of the Federal Motor Carrier Safety Regulations, certifying that they read and understood the requirements for drivers of motor carriers (Ferraro Aff. ¶ 25, Ex. 18)

- *Driver's Certification of Violation/Annual Review of Driving Record*, as required by 49 C.F.R. Section 391.27 of the Federal Motor Carrier Safety Regulations (Ferraro Aff. ¶ 26, Ex. 19)

- *Commercial Vehicle Driver Applicant, Controlled Substance and Alcohol Questionnaire*, pursuant to 49 C.F.R. part 40.25(j) of the Federal Motor Carrier Safety

---

[9] The Secretary of Transportation may prescribe regulations to carry out the duties and powers of the Secretary.  49 U.S.C. § 322(a).  Regulations issued by FMCSA are published in the Federal Register and compiled in the U.S. Code of Federal Regulations ("C.F.R.").  https://www.fmcsa.dot.gov/regulations.

Regulations (Ferraro Aff. ¶ 27, Ex. 20)

- Acknowledgement that they understand they are responsible under Federal and State DOT Regulations, to make sure the truck they operate is in good mechanical repair (Ferraro Aff. ¶ 28, Ex. 21)

- *Drug Testing Custody and Control Form*, as required by the USDOT pursuant to the FMCSA (Ferraro Aff. ¶ 29, Ex. 22)

- *U.S. Department of Transportation (DOT) Alcohol Testing Form*, pursuant to USDOT regulation, 49 C.F.R. Part 40 of the Federal Motor Carrier Safety Regulations (Ferraro Aff. ¶ 30, ex. 23)

- Acknowledgment of receiving J. King's Alcohol and Drug Abuse Policy and the "required USDOT urine drug test and breath alcohol regulations." (Ferraro Aff. ¶ 31, Ex. 24)

- *Medical Examiner's Certificate*, certifying that they were qualified to drive interstate, pursuant to 49 C.F.R. Section 391.41-391.49 of the Federal Motor Carrier Safety Regulations (Ferraro Aff. ¶ 32, Ex. 25)

- *Medical Examination Report for Commercial Driver Fitness Determination* (Ferraro Aff. ¶ 33, Ex. 26)

In addition, J. Kings provides Plaintiffs with a copy of the FMCSR Pocketbook which, among other things, details requirements under federal law for commercial motor carriers, and establishes minimum qualifications for persons driving commercial motor vehicles. *See* 49 C.F.R. §390.1, § 391.1. (Ferraro Aff. ¶ 34; Buscemi Aff. ¶ 8) J. Kings required that its drivers, including Plaintiffs, familiarize themselves with the regulations and acknowledge receiving a copy of the pocketbook. (Ferraro Aff. ¶ 34, Ex. 27)

Plaintiffs were also provided a copy of J. King's Fleet Safety Program which, in compliance with the Federal Motor Carrier Safety Regulations, established guidelines and procedures to be followed to protect the safety of drivers, passengers and the general public during the operation of any motor vehicle for J. Kings. (Ferraro Aff. ¶ 35, Ex. 28) Plaintiffs were required to comply with the policies and procedures contained in the Fleet Safety Program, and signed forms acknowledging the same. (Ferraro Aff. ¶ 36, Ex. 29)

F.     **The USDOT and FMCSA Have Exerted Jurisdiction**
       **Over J. Kings' Operations**

The Federal Motor Carrier Safety Administration ("FMCSA") is the USDOT agency responsible for regulating commercial motor carriers.  49 U.S.C. § 113.  The FMCSA's core mission is to prevent crashes, injuries and fatalities related to large trucks on interstate roads.[10]  The FMCSA conducted a safety audit of J. Kings in October 2009, to ensure compliance with Federal Motor Carrier Safety Regulations.  (Ferraro Aff. ¶ 21)  J. Kings was cited for violations of 49 C.F.R. § 395.8(a), for failure to require drivers to make a record of duty status.  (Ferraro Aff. ¶ 21)  The violations were corrected, and J. Kings has since received a satisfactory rating.  (Ferraro Aff. ¶ 21)

Moreover, as an interstate commercial motor carrier, J. Kings' safety performance has continued to be monitored under CSA ("Compliance, Safety and Accountability"), which is the safety compliance and enforcement program of the FMCSA that holds motor carriers and drivers accountable for their role in safety.[11]  (Ferraro Aff. ¶ 22)  J. Kings' safety data is recorded in FMCSA's Safety Measurement System ("SMS").  (Ferraro Aff. ¶ 22, Ex. 17)  FMCSA updates the SMS monthly with data from roadside inspections conducted by the USDOT, including driver and vehicle violations, crash reports from the last two years, and investigation results.[12]  (Ferraro Aff. ¶ 22, Ex. 17)

According to FMCSA's safety data as reported in the SMS of April 2018, J. Kings is identified as an interstate motor carrier.  (Ferraro Aff. ¶ 22, Ex. 17 at DEF 1-2)  Based on a 24-month record ending March 30, 2018, over 153 roadside driver inspections of J. Kings' drivers and vehicles had been conducted, and no violations for controlled substances and alcohol had been found.  (Ferraro Aff. ¶ 22, Ex. 17 at DEF 6-7)  During those inspections, the FMCSA also checked for driver fitness,

---

[10]  *Fox v. Commonwealth Worldwide Chauffeured Transp. of NY, LLC*, 865 F. Supp. 2d 257, 260 (E.D.N.Y. 2012); https://www.fmcsa.dot.gov/mission (last visited Oct. 10, 2019).
[11]  https://csa.fmca.dot.gov/Documents/What-Is-CSA-Factsheet.pdf (last visited Oct. 10, 2019).
[12]  https://csa.fmcsa.dot.gov/Documents/SMSMethodology.pdf (last visited Oct. 10, 2019).

including checking driver's licenses and medical cards.  (Ferraro Aff. ¶ 22, Ex. 17 at DEF 11-15)  Only 1 infraction was found in that two-year period, in which a driver did not have a valid medical card on his person at the time of the inspection.  (Ferraro Aff. ¶ 22, Ex. 17 at DEF 11-15)  Finally, J. Kings' drivers were also checked for hours-of-service compliance during those inspections, and no violations were found.  (Ferraro Aff. ¶ 22, Ex. 17 at DEF 16-20)  Indeed, Quartararo testified that he was pulled over at least six (6) times by the USDOT for safety inspections while driving J. Kings' trucks. (Quartararo Depo. Tr. 72:8-75:19)  When Quartararo was pulled over by the USDOT, he understood that the USDOT official could flag his vehicle as unsafe for the road and prevent him from driving. (Quartararo Depo. Tr. 82:6-18)

## ARGUMENT

### POINT I

### DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE THERE ARE NO GENUINE DISPUTES AS TO ANY MATERIAL FACTS

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  Under this standard, the mere existence of "*some* alleged factual dispute" will not defeat summary judgment, only disputes over genuine issues of material fact.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Ibid.*  In order to withstand summary judgment, the non-moving party cannot rely on the allegations in the pleadings, but must provide present "concrete evidence from which a reasonable [fact-finder] would return a verdict in [its] favor." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 256 (1986); *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006).

For claims brought under the FLSA, "[a] claim of exemption under the FLSA is an affirmative defense, and the employer bears the burden of proof in making any such claim." *Dejesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85, fn. 7 (2d Cir. 2013). Here, the claims asserted by Plaintiffs in the Complaint are, as a matter of law, insufficient to raise any genuine issue of material fact, because the Motor Carrier Act exemption applies to all Plaintiffs. Defendants' motion for summary judgment should be granted in its entirety.

## POINT II

### PLAINTIFFS' CLAIMS FOR OVERTIME VIOLATIONS UNDER THE FLSA FAIL BECAUSE THEY ARE EXEMPT UNDER THE MOTOR CARRIER ACT

In their First Cause of Action, Plaintiffs allege they were employees of J. Kings, and that they were entitled to premium wages for any hours worked over 40 per week under the FLSA. (Complaint ¶¶ 207-220) The FLSA requires employers to pay overtime for non-exempt employees working in excess of 40 hours per week "at a rate not less than one and one-half times the regular rate at which [the employee] is employed." 29 U.S.C. § 207(a)(1). The FLSA, however, exempts certain employees from its overtime requirements. Plaintiffs are not entitled to premium overtime pay under the FLSA, because they are exempt from its overtime provisions under the Motor Carrier Act.

Section 213(b)(1) of the FLSA, known as the Motor Carrier Act ("MCA") exemption, excludes from overtime-pay requirements "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49." 29 U.S.C. § 213(b)(1). In turn, Title 49, the Transportation Code, provides that the "Secretary of Transportation may prescribe requirements for … qualifications and maximum hours of service of employees of, and standards of equipment of, a motor private carrier, when needed to promote safety of operation. 49 U.S.C. § 31502. Thus, for an employee to fall within the MCA exemption: (1) the employer must qualify as a "motor carrier" or "motor private carrier" engaged in

interstate commerce; and (2) the employee must be engaged in activities that affect the "safety of operation of motor vehicles in interstate or foreign commerce." *Pyramid Motor Freight Corp. v. Ispass*, 330 U.S. 695, 698 (1947*). See also Chaohui Tang v. Wing Keung Enters*., 210 F.Supp.3d 376, 391 (E.D.N.Y. 2016) ("Activities of both the employer and the employee are necessarily considered when determining the applicability of the MCA exemption.").

### A.   J. Kings Is a Motor Carrier Engaged In Interstate Commerce

Under the statute, a "motor private carrier" is defined as "a person, other than a motor carrier, transporting property by motor vehicle," and is the "owner, lessee, or bailee" of that property for purposes of "sale, lease, rent, or bailment or to further a commercial enterprise,"  49 U.S.C. § 13102(15).  J. Kings, as a commercial distributor of food items throughout the country, fits squarely within that definition.  Companies that transport goods in interstate commerce are required to have interstate Operating Authority, or an "MC number" in addition to a DOT number.[13]  During the relevant time period, J. Kings was registered with the FMCSA and maintained both a USDOT number and an MC number.  (Ferraro Aff. ¶ 16)   Given the nature of Defendants' business, the significant proportion of out-of-state sales and deliveries made by the company over the relevant time period, and the DOT's certification of J. Kings as a Motor Carrier, there can be no dispute that J. Kings qualifies as a motor carrier engaged in interstate commerce.

### B.   Plaintiffs' Activities Fall Within the Motor Carrier Act Exemption

Moreover, Plaintiffs activities, as drivers for J. Kings, fall within the MCA exemption because they were employees of a motor carrier and engaged in safety-affecting activities on motor vehicles in interstate commerce.  This is consistent with a fair reading of the statute.

---

[13] 49 C.F.R. §§ 365.105, 365.106T; https://www.fmcsa.dot.gov/registration/get-mc-number-authority-operate

The United States Supreme Court recently pronounced that exemptions to the FLSA should be given a "fair reading," explicitly rejecting the former guiding principle that exemptions to the FLSA should be narrowly construed. *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018). The Supreme Court reasoned that FLSA exemptions "are as much a part of the FLSA's purposes as the overtime-pay requirement." *Ibid.* The Second Circuit has followed suit. *See Munoz-Gonzalez v. D.L.C. Limousine Serv*., 904 F.3d 208, 215-16 (2d Cir. 2018) (adopting Supreme Court's mandate that FLSA exemptions must now be given a fair interpretation, rather than narrow interpretation); *Flood v. Just Energy Marketing Corp*., 904 F.3d 219, 228 (2d Cir. 2018) (recognizing Supreme Court's rejection of narrow interpretation of FLSA exemptions and adopting fair reading standard); *JihuiZhang v. XYZ Limousine, Inc.*, No. 15-CV-7440 (JS) (AKT), 2019 WL 1220310 (E.D.N.Y. Mar. 15, 2019) (same).  In that manner, courts are to give the terms in the statute their "ordinary meaning." *Encino Motorcars*, 138 S.Ct. at 1140.

In this case, the applicable statute neither defines nor describes safety-affecting activities on vehicles involved in interstate commerce.  If ambiguous, the Second Circuit instructs that courts should assess how Congress and other courts have used the language, referring to contemporaneous sources.  *Munoz-Gonzalez*, 2018 WL 4471522 at *3-4.  The Motor Carrier Act was enacted in 1935. Contemporaneous decisions from the Supreme Court had found that the activities of drivers, driver's helpers, loaders and mechanics employed by motor carriers or motor private carriers directly affect the safety of vehicle operation, and thus fall within this exemption. *See Morris v. McComb*, 332 U.S. 422 (1947); *Levinson v. Spector Motor Service*, 330 U.S. 649 (1947); *Pyramid Motor Freight Corp.*, 330 U.S. 695 (1947); *Southland Gasoline Co. v. Bayley*, 319 U.S. 44 (1943).

The Court's discussion of the MCA exemption in *Morris* is particularly instructive.  In that case, the employer was a motor carrier, whose principal business was the transportation of steel.  *Id*.

at 426.  The company employed about 40 truck drivers, and had about 50 trucks and 60 trailers.  *Ibid*.

During the course of the year, the drivers combined made a total of 19,786 trips on trucks or trailers,

only 724 of which were made in interstate commerce, which constituted 3.65% of the total trips driven.

*Id.* at 432-33.  Moreover, the out-of-state trips were not distributed equally to each driver, but were

"distributed generally throughout the year."  *Id.* at 433.  The Court found that the trips were "a natural,

integral and apparently inseparable part of the common carrier service of the petitioner and of his

drivers."  *Ibid.*  Further, in that case, the average number of drivers making interstate trips per week

was nine (9) out of thirty-seven (37), or 24.4% of the drivers.  *Ibid*.  As for the distribution of trips

throughout the year, two drivers never went out of state, and one made 97 of the trips.  *Ibid*.  Based on

those facts, the Court reasoned that the employer needed to comply with the requirements established

by the Interstate Commerce Commission[14] with regard to qualifications and maximum hours of service

for all drivers in order to be able to provide interstate service to its customers on demand.  *Id.* at 434.

The Court held that:

> [T]he Commission has the power to establish qualifications and maximum
> hours of service, pursuant to the provisions of §204 of the Motor Carrier
> Act, for the <u>entire classification of petitioner's drivers</u>... and it is <u>the
> existence of that power</u> (rather than the precise terms of the requirements
> actually established by the Commission in the exercise of that power) that
> Congress has made the test as to whether or not §7 of the Fair Labor
> Standards Act is applicable to these employees.

*Ibid.*

Similarly here, Plaintiffs here were employed as drivers.[15]  As drivers, Plaintiffs' fall within

the MCA exemption because they engaged in safety-affecting activities in interstate commerce,

---

[14] In 1966, the authority to regulate safety operations for motor vehicles under the MCA was transferred from the ICC to the Department of Transportation.  *Bilyou v. Dutchess Beer Distributors, Inc*., 300 F.3d 217, 222, fn. 2 (2d Cir. 2002); ICC Termination Act of 1995, Pub.L. No. 104–88, § 101, 109 Stat. 803, 804 (1995).

[15] Under the statute, "Driver means any person who operates any commercial motor vehicle".  *See* 49 C.F.R. Section 390.5.  In determining whether an employee falls within such an exempt category, neither the name given to his position nor that given to the work that he does is controlling.  *Pyramid Motor Freight Corp. v. Ispass*, 330 U.S. 695, 707 (1947).

including loading, driving, and delivering goods out of state when needed, maintaining their vehicles in good condition for interstate travel, and maintaining their knowledge of DOT safety procedures to ensure the safety of themselves, their passengers and others in interstate travel.

Moreover, during the relevant time period, J. Kings had between 45-65 drivers at one time, and about 70-80 trucks over 10,001 pounds. (Ferraro Aff. ¶ 18, 45, Ex. 15) On average, between 2014 and 2016, about 13% to 28% of the routes for J. Kings, per month, involved travel in interstate commerce (compared to 3.65% in *Morris*). (Ferraro Aff. ¶ 43, Ex. 31) As in the *Morris* case, the trips were not distributed evenly, but indiscriminately, based on business needs. (Ferraro Aff. ¶ 41; Buscemi Aff. ¶¶ 9, 10; Sandford Aff ¶¶ 5, 6) As a large percentage (up to 12%) of J. King's business entailed delivery to customers outside of New York, and up to 28% of delivery routes went out of state, drivers for J. Kings could be called upon at any time to drive an interstate route. (Ferraro Aff. ¶¶ 19, 42, 43, Exs. 16, 31; Sandford Aff. ¶ 6) Plaintiffs were further put on notice of the possibility of interstate travel through J. Kings' requirement that Plaintiffs maintain various certifications in order to comply with the Federal Motor Carrier Safety Regulations for interstate travel. Based on the reasoning in *Morris*, the Secretary of Transportation would likewise have jurisdiction to establish qualification and maximum hours of service for <u>all J. Kings drivers</u>, regardless of the frequency of interstate travel. *Morris*, 332 U.S. at 434.

Other courts have similarly held that interstate travel that constitutes a 'natural, integral and ... inseparable part' of the employees' duties, such that any employee is likely to be called on to perform interstate travel, the employees are all subject to the motor carrier exemption while they fill that position regardless of the actual number of hours they individually devote to interstate travel." *Dauphin v. Chestnut Ridge Transp., Inc.,* 544 F.Supp.2d 266, 273 (S.D.N.Y. 2008), (*quoting Morris* v. *McComb,* 332 U.S. 442). *See also Resch v. Krapf's Coaches, Inc.*, 785 F.3d 869, 871 (2015)

(holding that all transit drivers for company fell within the scope of the MCA exemption, even though a mere 1.3% of the trips required out of state travel, and sixteen (16) of the plaintiffs never crossed state lines, and eight (8) of the plaintiffs only drove out of state once).

Here, 78% of J. Kings' drivers made a trip out of state at some point during their employment. (Ferraro Aff. ¶ 44, Ex. 32; Buscemi Aff. ¶ 13)  Thus, not only was it a theoretic possibility that the drivers could be called upon to drive a route that required interstate travel, nearly all of the drivers for J. Kings drove outside New York at some point during the relevant time period.  In fact, three of the four Plaintiffs drove trucks for J. Kings out of state at some point during their employment.  (Ferraro Aff. ¶¶ 38, 47, 48, Exs. 30, 33, 34; Opinski Depo. Tr. 135:25-138:5, 152:1-7, 163:7-22, 182:3-17, 195:7-15, 196:25-198:22; Barclay Depo. Tr. 122:16-123:16, 193:13-198:16, 201:20-202:22, 230:13-231:21; Keresztes Depo. Tr. 90:1-8)  As the Supreme Court instructed in *Morris*, even when an employee engages in interstate transportation during a "minority of their time" working, the MCA exemption still applies, as the Secretary of Transportation still has jurisdiction to set the employees' requirements with respect to qualifications, maximum hours of service and safety of operation and equipment.  *Morris*, 332 U.S. at 437-38.  Even where the employer assigns relatively few interstate routes, the MCA exemption is applicable where any driver could receive one of those routes.  *Masson v. Ecolab, Inc.,* 2005 WL 2000133, at *6 (S.D.N.Y. Aug.17, 2005) ("[I]f the employee is or 'is likely' to be 'called upon in the ordinary course of his work to perform, either regularly or from time to time, safety-affecting activities,' he falls under the exemption 'in all workweeks when he is employed at such job.'") (*quoting* 29 C.F.R. § 782.2(b)(3)).  As such, the MCA exemption would apply to all of J. King's drivers, regardless of whether they actually drove across state lines on any particular week.

Defendants' interpretation of the exemption also fits in with the overall FLSA structure of excluding from its protection transportation workers.  *See Munoz-Gonzalez*, 2018 WL 4471522 at * 5

16

(instructing courts in the Second Circuit to test whether their interpretation of an exemption fits within the overall statutory scheme). The MCA was enacted three years before the passage of the FLSA, to promote efficiency and safety in interstate motor transportation." *Bilyou v. Dutchess Beer Distributors, Inc.*, 300 F.3d 217, 229, n.2 (2d Cir. 2002). The FLSA specifically excluded from its overtime provisions any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service. *See* 29 U.S.C. § 213(b)(1). "The purpose of the motor carrier exemption is to avoid subjecting employers to overlapping regulatory regimes." *Fox v. Commonwealth Worldwide Chauffeured Transp. of NY, LLC*, 865 F. Supp. 2d 257, 264 (E.D.N.Y. 2012) (*citing Levinson v. Spector Motor Serv.*, 330 U.S. 649, 661 (1947)). Thus, under the required fair reading of the statute, each of the Plaintiffs fall within the MCA exemption, and the First Cause of Action must be dismissed. *Encino Motorcars*, 138 S.Ct. at 1142.

## POINT III

### PLAINTIFFS' CLAIMS FOR OVERTIME VIOLATIONS UNDER THE NYLL ARE LIKEWISE MERITLESS

In their Second Cause of Action, Plaintiffs seek unpaid overtime wages under the NYLL. Because Plaintiffs are subject to the FLSA exemption under the MCA, they are also exempt from the NYLL's overtime provisions. *See Fox v. Commonwealth Worldwide Chauffeured Transp. of NY, LLC*, 2012 WL 1078230, at *8 (E.D.N.Y. Mar.30, 2012) ("The New York State Department of Labor takes the position that the overtime provisions contained in [the NYLL] expressly incorporate the FLSA's exemptions"). Indeed, "Federal courts have followed the Department's guidance, applying FLSA exemptions to state Labor Law claims." *Ibid.* (*citing Torres v. Gristede's Operating Corp.,* 628 F.Supp.2d 447, 456 n. 4 (S.D.N.Y.2008)). *See also Clarke v. JPMorgan Chase Bank, N.A.*, No. 08 CIV. 2400 CM/DCF, 2010 WL 1379778, at *15 n. 7 (S.D.N.Y. Mar. 26, 2010). Thus, Plaintiffs cannot succeed on their overtime claims under the NYLL, and the Second Cause of Action must be dismissed.

## POINT IV

## PLAINTIFFS CANNOT SUCCED ON THEIR
## WAGE NOTICE CLAIM UNDER NYLL 195(1)

In their Third Cause of Action, Plaintiffs claim that Defendants failed to provide proper wage notices with the requisite information, in violation of NYLL § 195(1).  The statute provides that every employer must notify its employees, in writing, "at the time of hiring" of the rate of pay, the regular pay day, and obtain written acknowledgment of receipt of the notice.  *Ibid*.  However, the statutory provision did not go into effect until April 9, 2011, and therefore only applies to new hires on or after the effective date of April 9, 2011.  NYLL § 195(1)(a), 2010 N.Y. Laws Ch. 564 § 3 (effective Apr. 9, 2011) (amended by 2014 N.Y. Laws Ch. 537 § 1).

Here, Plaintiff Quartararo commenced his employment on June 6, 2002.  (Ferraro Aff. ¶ 3, Ex. 1)  Plaintiff Keresztes commenced employment on July 5, 1999.  (Ferraro Aff. ¶ 3, Ex. 2)  Plaintiff Barclay began employment with Defendants on June 5, 1997.  (Ferraro Aff. ¶ 3, Ex. 3)  Plaintiff Opinski began his employment in September 1997.  (Ferraro Aff. ¶ 3, Ex. 4)  Thus, all Plaintiffs commenced employment with J. Kings well before the requirements of NYLL § 195(1)(a) took effect, and therefore they have no right of action under the statute for failure to provide wage notices.  *See Gamero v. Koodo Sushi Corp.*, 272 F. Supp. 3d 481, 510 (S.D.N.Y. 2017), aff'd, 752 F. App'x 33 (2d Cir. 2018) (holding that plaintiffs whose employment predated enactment of the law were ineligible for recovery); *Pierre v. Hajar, Inc.*, No. , 2018 WL 2393158 at * 5 (E.D.N.Y. Mar. 28, 2018) (holding that plaintiff could not recover under NYLL § 195(3) because the "WTPA does not apply retroactively").  Regardless, Plaintiffs received wage notices in 2013 and 2014.  (Ferraro Aff. ¶ 14, Ex. 14)  Plaintiffs' Third Cause of Action must be dismissed.

## POINT V

## PLAINTIFFS CANNOT SUCCED ON THEIR
## CLAIM FOR VIOLATION OF NYLL 195(3)

In their Fourth Cause of Action, Plaintiffs claim that Defendants violated NYLL §195(3) by failing to provide accurate wage statements containing J. King's address, name of employee, name of employer, address and phone number of employer, rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; gross wages, hourly rate or rates of pay and overtime rate or rates of pay if applicable, the number of hours worked, deductions and net wages, in violation of NYLL § 195(3).  Plaintiffs' claims are meritless.

Plaintiffs fail to identify what specific information they contend is missing from the wage statements, and instead simply conclude that the wage statements are deficient.  (Complaint ¶¶ 236-240)  Moreover, Plaintiffs presented no evidence of any deficiencies in the wage statements.  Instead, the wage statements were accurate and contained the necessary information required by statute, including among other things, dates of work covered, name of employee and employer, address and phone number of employer, rate of pay and basis thereof, gross wages, deductions and allowances. (Ferraro Aff. ¶ 12, Exs. 10-13)  With regard to any technical violations, NYLL §198 (1-d) provides a complete defense where the employer still timely paid all required wages.  *Ahmed v. Morgans Hotel Grp. Mgmt., LLC,* 54 Misc. 3d 1220(A), 55 N.Y.S.3d 691 (N.Y. Sup. Ct. 2017); *Martin v. Sprint United Mgmt. Co.,* 2017 WL 5028621, at *3 (S.D.N.Y. Oct. 31, 2017).  As a result, Plaintiffs cannot succeed on their claim under NYLL §195(3).

To the extent Plaintiffs' claim is based on an argument that the wage statements did not include overtime hours and overtime pay rates, it is also meritless.  Because Plaintiffs were exempt from the overtime provisions of the FLSA and NYLL under the MCA exemption, J. Kings was not required to include in their wage statements information concerning the overtime rate or pay, or overtime hours

worked.  NYLL § 195(3).  The statute specifically provides that such information is only applicable to employees "who are not exempt from overtime compensation."  *Ibid*.  See *also Mohammed v. Start Treatment & Recovery Centers, Inc*., 64 Misc. 3d 1, 9, 95 N.Y.S.3d 711, 717 (N.Y. App. Term. 2019).

## POINT VI

### BARCLAY AND OPINSKI'S CLAIMS FOR RETALIATION<br>UNDER THE NYLL ARE MERITLESS

In their Fifth and Sixth Causes of Action, Barclay and Opinski claim they were retaliated against in violation of the NYLL.  (Complaint ¶¶ 241-256)  Their claims are meritless and must be dismissed.  Section 215 of the NYLL provides that an employer may not discharge or retaliate against an employee because such employee made a complaint to his or her employer that the employer had engaged in conduct that the employee reasonably believed violated a provision of the Labor Laws. NYLL § 215(1)(a).

Retaliation claims under the NYLL are analyzed under the three-step burden-shifting framework identified in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1972).  *Crawford v. Coram Fire Dist.*, No. 12 CV 3850, 2014 WL 1686203, at *5 (E.D.N.Y. Apr. 29, 2014).  In order to state a *prima facie* case of retaliation under the NYLL, Barclay and Opinski must each establish that: (l) he made a complaint to the employer that the employer engaged in conduct that he reasonably and in good faith believed violated the New York Labor Law; (2) he was terminated or otherwise subject to an adverse employment action; and (3) there was a causal connection between the complaint and the retaliatory action.  *Grella v. St. Francis Hosp*., 149 A.D.3d 1046, 1049 (2d Dep't 2017); *Higueros v. New York State Catholic Health Plan, Inc.*, 526 F. Supp. 2d 342, 347 (E.D.N.Y. 2007).  Under the NYLL, Plaintiffs must show that they complained about a "specific violation of the Labor Law." *Mayer v. Neurological Surgery, P.C*., 2016 WL 347329 at * 3 (E.D.N.Y. Jan. 28, 2016).  While plaintiffs need not cite a specific statute, "the complaint to the employer must be of a colorable

violation of the statute." *Ibid*. Here, neither Barclay nor Opinski can meet their initial burden of making a *prima facie* case of retaliation, because they never made a complaint of a Labor Law violation to their supervisors. Even if they could meet their initial burden, J. Kings had a legitimate business reason for terminating both Barclay and Opinski.

### A.   Barclay Fails to State a Claim of Retaliation

Barclay alleges that he suffered chest pains at work, informed Defendants on August 10, 2016 and September 2, 2016, that "he would need lighter workloads," was laughed at by HR and his request was not accommodated. (Complaint ¶¶ 242-247) He also alleges he sent a text message to "J. Kings management," that he had not been feeling well and "trying to figure out why you been over loading and rt me out over 11 hours can you please ease up," to which J. Kings management responded "It's just not only you working over 11. I'm trying to do my best I go every day on the road and later route. So if you think I'm picking on you to work more. I'm sorry you feel that way." (Complaint ¶¶ 248-249) Barclay alleges he underwent surgery on September 13, 2016 and, while on medical leave, he was terminated. (Complaint ¶¶ 250-251)

There is no evidence in the record that Barclay complained to any of his supervisors about any violation of the New York Labor Law. (King Aff. ¶ 8; Ferraro Aff. ¶ 52; Buscemi Aff. ¶ 15; Sandford Aff. ¶ 12) During his deposition, Barclay confirmed that he never complained about any wage violations. (Barclay Depo. Tr. 72:12-74:11) Moreover, he admitted he never asked for a different work schedule or route. (Barclay Depo. Tr. 96:16-21) As such, Barclay cannot meet the first prong of his *prima facie* case.

Nor can Barclay show a causal connection between his termination and any complaint. Barclay went out on a leave of absence from J. Kings beginning in August 2016, and never returned to work. (Ferraro Aff. ¶¶ 15, 49; Barclay Depo. Tr. 21:22-23:3, 34:22-35:5) However, during the time in which he claims he was unable to work, he was working another job at West Islip School District. (Barclay

21

Depo. Tr. 23:12-18, 43:22-44:10)   Barclay's employment with J. Kings was terminated effective November 17, 2016, because he had exhausted his leave time under the Federal Medical Leave Act ("FMLA"), and he never advised J. Kings that he would be returning to work.  (King Aff. ¶ 8; Ferraro Aff. ¶ 50, 51, Ex. 35)  Even if Barclay could show a *prima facie* claim of retaliation, J. Kings had a legitimate business reason for terminating Barclay after he exhausted his FMLA leave, and leaving the company short on drivers.  Barclay's retaliation claim under NYLL § 215 should be dismissed.

    **B.**    <u>**Opinski Fails to State a Claim of Retaliation**</u>

       Similarly, Opinski also cannot make a *prima facie* claim of retaliation.   In the Complaint, Opinski only alleges that "[T]hroughout 2013 to 2014, [he] informed Defendants that he would require lighter workloads," and Defendants refused to accommodate his request.  (Complaint ¶¶253-254)  Opinski asserts he was injured at on April 24, 2015, and terminated while on leave.  (Complaint ¶¶ 255-256)

       There is no evidence in the record that Opinski complained to any of his supervisors about any violation of the New York Labor Law.  (King Aff. ¶ 9; Ferraro Aff. ¶ 55; Buscemi Aff. ¶ 17; Sandford Aff. ¶ 11)  At his deposition, Opinski confirmed that he never disputed his time records or made a complaint that his hours were incorrect.  (Opinski Depo. Tr. 117:17-22)  Instead, Opinski only asked his supervisors for less strenuous routes because of his knee injuries.  (Opinski Depo. Tr. 36:23-38:21)

       There is also no evidence of a causal connection between any complaint made and Opinski's termination.  Instead, the evidence shows that Opinski went out on numerous leaves of absences prior to his termination, and was accommodated with requests for light work or modified work schedules as recommended by his physician.  (Ferraro Aff. ¶ 53; Opinski Depo. Tr. 34:3-36:8, 42:3-44:3)  For example, Opinski's doctor took him out of work for six (6) months, from May 30, 2013 to November 25, 2013, and J. Kings accommodated his return to light duty work on a modified work schedule of two days per week.  (Opinski Depo. Tr. 23:22-27:24)  Based on his doctor's further recommendations,

Opinski's schedule was again modified to three days per week in December 2013, four days per week in February 2014, and then five days per week in March 2014.  (Opinski Depo. Tr. 28:18-33:15) After he returned to work full-duty, Opinski injured himself again and went out on another leave of absence from August 28, 2014 to December 18, 2014.  (Opinski Depo. Tr. 34:3-35:24; Ferraro Aff. ¶ 53) Opinski then took another leave of absence from February 12, 2015 to April 8, 2015, and J. Kings accommodated his return to work two days a week on light duty.  (Opinski Depo. Tr. 42:3-44:3; Ferraro Aff. ¶ 53)  Opinski's last day of work for J. Kings was only days later, on April 24, 2015, when he again took a leave of absence and never returned to work.  (Opinski Depo. Tr. 7:7-12, 184:14-185:1; Ferrara Aff. ¶ 53) Opinski's employment was terminated on July 9, 2015, when he was advised that J. Kings could no longer hold his job.  (Opinski Depo. Tr. 14:23-15:12; Ferraro Aff. ¶ 54)  Opinski admitted that, at that point, he had been out of work for at least 12 weeks during the past year.  (Opinski Depo. Tr. 186:3-5) Thus, even if Opinski could make out a *prima facie* case of retaliation, J. Kings had a legitimate business reason for his termination.  Opinski's retaliation claim should be dismissed.

## C.   Opinski's Retaliation Claim Is Time-Barred

Opinski's retaliation should also be dismissed because it is time-barred under NYLL § 215(2)(a).  The statute provides that an employee may bring a civil action in court against any employer alleged to have violated the provisions of the section "within two years after such violation." NYLL § 215(2)(a).  Opinski was terminated on July 9, 2015.  (Opinski Depo. Tr. 14:14-15:12; Ferraro Aff. ¶ 54) The Complaint was not filed until December 19, 2017 -- more than two years after his termination.  (ECF Docket No. 1)  Accordingly, the Sixth Cause of Action must be dismissed.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that this Court grant their motion for summary judgment, dismiss the Complaint in its entirety, and provide such other and further relief as this Court deems just and appropriate.

Dated: New York, New York         **PUTNEY, TWOMBLY, HALL & HIRSON LLP**
      October 30, 2019

                                 ___/s/ JEM_____
                                 James E. McGrath, III
                                 Rebecca K. Kimura
                                 **PUTNEY, TWOMBLY, HALL & HIRSON LLP**
                                 521 Fifth Avenue
                                 New York, New York 10175
                                 (212) 682-0020

                                 *Attorneys for Defendants, J. Kings Food Service*
                                 *Professionals, Inc., and John King*