UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------------X
JESSE QUARTARARO, KEVIN KERESZTES, JOHN
BARCLAY, AND MICHAEL OPINSKI,

                             Plaintiffs,

                - against –

J. KINGS FOOD SERVICE PROFESSIONALS, INC. AND
JOHN KING

                         Defendants.
-----------------------------------------------------------------------------X
ROSLYNN R. MAUSKOPF, United States District Judge.

**MEMORANDUM
AND ORDER**
17-CV-7390 (RRM)

Plaintiffs, former deliverymen with J. Kings Food Services Professionals, Inc. ("JKF"), a

food distributor, brought this claim for overtime under the Fair Labor Standards Act ("FLSA"),

29 U.S.C. § 207(a)(1) and the New York Labor Law ("NYLL"), for defective wage notices

under the New York Labor Law, and for retaliation under the New York Labor Law against John

Barclay and Michael Opinski.  Defendants now move for summary judgment on all of these

claims. Plaintiffs oppose and cross-move for summary judgment on their overtime claim, and

defendants oppose plaintiffs' cross-motion.  Of central importance to these cross-motions is the

question of whether the "Motor Carrier Act" exemption to the FLSA's overtime rules apply to

these employees.  For the reasons stated below, defendant's motion for summary judgment is

granted in part and denied in part, and plaintiffs' motion for partial summary judgment is granted

as to Quartararo and denied as to Barclay, Keresztes, and Opinski.

## BACKGROUND

### I.  Plaintiffs' Employment with JKF

Defendant J. Kings Food Service Professionals, Inc. is a New York company, with its principal office in Holtsville, New York.  (Pl.'s 56.1 at ¶ 1).  Defendant John King ("King") is the founder, Chief Executive Officer ("CEO"), and Chief Customer Officer of J. Kings.  (King Aff. (Doc. No. 69) at ¶ 1.)  Beginning on July 8, 2010, when JKF switched from paying an hourly rate to paying its drivers by the day, JKF did not pay any of the plaintiffs the statutory overtime rate of time-and-a-half for any hours they worked over 40 per week.  (Compl ¶¶ 9–10.; Def.'s Resp. To Pl.'s 56.1 (Doc. No. 67) at ¶ 10.)

#### a.   Terms of Employment, Weekly Hours and Job Titles of the Plaintiffs

Quartararo worked at JKF from 2002 to 2016.  (Quartararo Aff. (Doc. No. 62) at ¶ 2); (Def.'s Resp. to Pl.'s 56.1 at ¶ 20.)  Quartararo claims that from 2011 to 2016 he regularly worked Monday through Saturday and averaged 60 hours per week.  (Quartararo Aff. At ¶ 5.)  JKF's records show that Quartararo worked variable weekly hours during this period, though they do not suggest an average amount. (Def.'s Ex. Q (Doc. No. 61-4).)

Keresztes worked at JKF from July 5, 1999, to July 29, 2016.  (Keresztes Aff. (Doc. No. 64) at ¶ 2); (Def.'s Resp. to Pl.'s 56.1 at ¶ 46.)  Keresztes claims that he regularly worked six days per week, Monday through Saturday, and averaged 60 hours per week. (Keresztes Aff. ¶ 3.)  JKF's records show that he usually worked less than 60 hours per week.  (Def.'s Ex. M (Doc. No. 61).)

Barclay worked at JKF from August 1997 until August 2016, though it is disputed whether he remained employed until November 2016.  (Def.'s Resp. to Pl.'s 56.1 at ¶ 52.)  Barclay claims that he regularly worked six days per week and averaged 50 to 55 hours per

week, inclusive of an additional hour per day spent doing pre- and post-shift work.  (Barclay Aff. (Doc. No 65) at ¶ 9–11.)  JKFs records indicate that he typically worked less than 50 hours per week.  (Def.'s Ex. K (Doc. No. 60-11).)

Opinski worked at JKF from September 1996 to July 9, 2015.  (Opinski Aff. (Doc. No. 63) at ¶ 3.) He claims he worked an average of 62 hours per week.  (*Id*. at ¶ 5.)  JKF's records show that he rarely worked over 60 hour per week.  (Def.'s Ex. O (Doc. No. 61-2).)

Keresztes, Quartararo, Barclay, and Opinski all claimed that they were not permitted breaks "for meals or any other purpose."  (Keresztes Aff. at ¶ 2; Quartararo Aff. at ¶ 7; Barclay Aff. at ¶ 13–15; Opinski Aff. at ¶ 6.)  However, Opinski contradicted this point in his deposition, testifying employees could stop at their discretion for meal breaks.  (Opinski Dep. (Doc. No. 60-4) at 113:21–24.)

Each plaintiff twice signed a "Notice and Acknowledgment of Pay Rate and Payday" pursuant to NYLL § 195 ("195 Notice"): once during 2013, and once again at the beginning of 2014.  (Pl.'s Resp. to Def.'s 56.1 at ¶¶112–13 (Quartararo); *id*. at ¶¶114–15 (Keresztes); *id*. at ¶¶116–17 (Barclay); *id*. at ¶ 118 (Opinski).[1])  Weekly paystubs for each plaintiff covering periods spanning 2014 to 2016, list JKF's name, address, and phone number in the footer.  (Pl.'s Ex. P (Doc. No. 60-3) (Quartararo, Feb. 20, 2014–July 14, 2016); Pl.'s Ex. L (Doc. No. 60-12) (Keresztes, Feb. 20, 2014–Aug. 4, 2016); Pl.'s Ex. J (Doc. No. 60-10) (Barclay, Feb. 20, 2014–Dec. 30, 2016); Pl.'s Ex. N (Doc. No. 60-1) (Opinski, Feb. 20, 2014–April 30, 2015).)  The calculation of each employee's pay was listed in a table at the top left of the pay stub underneath his name.  The rate was given for each pay period, which was then multiplied by an integer in the

---

[1] The record only shows that Opinski signed once, in 2014.

"hours" column to the right to calculate the employee's gross weekly pay.  The bottom left listed "Taxes withheld," and the top right listed benefits paid by the company.

During the times relevant to this case, Robert Sandford was a routing manager at JKF. (Sandford Dep. (Doc. No. 60-8) at 6:22–25, 7:6–7), and Christopher Buscemi was a transportation manager at JKF.  (Buscemi Dep. (Doc. No. 60-9) at 7:4–7.)

### b.   Operations of JKF

JKF operates primarily in New York, with some operations across the rest of the country, and from 2011 to 2017 had between $11.7 million and $22.3 of sales outside of New York, 12% of its total business.  (Pl.'s Resp. to Def.'s 56.1 at ¶ 77.)  Its internal records show that between 15.2% and 37.5% of JKF's daily delivery routes serviced customers in New Jersey, Connecticut, and Massachusetts.  (Def.'s Ex. 31(Doc. No. 50-15).)  Greg Ferraro, the President of JKF, oversees JKF's day-to-day operations.  (Ferraro Aff. (Doc. No. 48) at ¶ 1–2.)  His analysis of JKF's records found that 76 out of 97, or 78% of all drivers employed from 2011 to 2016, drove out of state "at some point during their employment."  (Ferraro Aff. at ¶ 44; Def.'s Ex. 32 (Doc. No. 51).)

The undisputed record shows that all of the driver-plaintiffs in this case made at least one delivery out of state during their employment, except for Quartararo.  Opinski regularly made deliveries out of state, including to Connecticut and New Jersey.  (Pl.'s Resp. to Def.'s 56.1 at ¶¶ 102–104.)  Time records furnished by JKF show that between 2014 and 2015 he made these trips continuously and, with the exception of certain routes, according to no definite weekly schedule. (Def.'s Ex. 33 (Doc. No. 51-1) at 7–25.)  Barclay made at least one trip to New Jersey and one trip to Massachusetts during his time at JKF.  (Pl.'s Resp. to Def.'s 56.1 at ¶ 106–07; *see also* Def.'s Ex. at 2–4.)  JKF's data also showed that he made a trip to Connecticut in May 2013.

(Ferraro Aff. at ¶ 47.)  However, Barclay claims that he was only driving through Connecticut on the trip that terminated in Massachusetts.  (Barclay Aff. (Doc. No. 65) at ¶ 6.)  An itinerary Barclay submitted in response to a discovery request shows that he made a delivery to Newark, New Jersey, on February 13, 2014.  (Def.'s Ex. 30 (Doc. No. 50-14) at 2.)  Keresztes drove to New Jersey once early on in his time at JKF.  (Pl.'s Resp. to Def.'s 56.1 at ¶ 109.)  Company records also show that he made a delivery to Connecticut in 2010.  (Def.'s Ex. 33 at 6.) However, he claims that he has not left New York on a delivery since 2011.  (Keresztes Aff. at ¶ 5.)  JKF never asked Quartararo to make a delivery outside of New York.  (Def.'s Resp. to Pl.'s 56.1 at ¶ 45.)

### c.      Regulation of JKF by Federal Authorities

JKF's safety data is recorded in the Federal Motor Carriers Safety Administration's ("FMCSA's") Safety Measurement System, which FMCSA keeps updated with data from roadside inspections, crash reports, and investigation results.  (Pl.'s Resp. to Defs.' 56.1 at ¶ 62.) The FMCSA conducted a safety audit of JKF in October 2009, at which time they cited JKF for failing to require drivers to "make a record of duty status."  (Pl.'s Resp. to Def.'s 56.1 at ¶¶ 58– 59.)  Ferraro affirmed that JKF subsequently corrected the problems that led to this citation and that it continues to be monitored for safety compliance by the FMCSA, which identifies JKF as "an interstate motor carrier" and regularly conducts roadside inspections of JKF's vehicles. (Ferraro Aff. at ¶ 21–22; Defs.' Ex. 17 (Doc. No. 50-1)).  The parties do not dispute that, during the two-year period ending in April 2018, the FMCSA conducted 153 roadside driver inspections to check drivers' licenses, medical cards and hours-of-service, and that these inspections did result in one infraction for a driver without a valid medical card on his person at the time of inspection.  (Pl.'s Resp. to Defs.' 56.1 at ¶¶ 65–67.)

JKF required that drivers list accidents in their job applications and accede to investigation per the USDOT regulations.  (Pl.'s Resp. to Def.'s 56.1 at ¶ 43.)  JKF also required that they obtain FMCSA certifications, sign a "Certificate of Compliance with Driver License Requirements" required by USDOT regulations, and, once a year, sign a "Driver's Certification of Violation/Annual Review of Driving Record" also required by USDOT regulations.  (Pl.'s Resp. to Def.'s 56.1 at ¶¶ 44–46.)  Plaintiffs during their employments signed a "Commercial Vehicle Driver Applicant, Controlled Substance and Alcohol Questionnaire" required by USDOT regulations, an acknowledgment that federal and state DOT regulations required them to ensure their trucks were in good mechanical repair, a "Drug Testing Custody and Control Form" as required by the FMCSA, and an alcohol testing form "pursuant to USDOT regulation."  (*Id*. at ¶¶ 47–51.)  Finally, plaintiffs signed a certificate certifying to the USDOT that they were qualified to drive interstate, and a "Medical Examination Report for Commercial Driver Fitness Determination."  (*Id*. at ¶¶ 52–53.)

During a roadside check, a USDOT official once inspected Quartararo's truck for safety, including brakes, lights, and Quartararo's documentation, and Quartararo may have received a safety-related citation from the inspector.  (Pl.'s Resp. to Defs.' 56.1 at ¶¶ 70–71.)  Quartararo understood that the USDOT inspector could flag his vehicle for safety, preventing him from driving.  (Pl.'s Resp. to Defs.' 56.1 at ¶ 72.)

### d.      Departure of Barclay and Opinski

Barclay testified that in June, 2016, he stopped working on the advice of his physician. (Def.'s Resp. to Pl.'s 56.1 at ¶ 66.)  Barclay's last day of work at JKF was about August 4, 2016, when he began a medical leave of absence from which he ultimately did not return.  (Pl.'s Resp. to Def.'s 56.1 at ¶ 123–24.)  John King, on behalf of JKF, officially terminated Barclay on

November 17, 2016.  (*Id*. at ¶¶ 127, 133.)  King affirmed that he did so because Barclay had exhausted his leave time under the Family and Medical Leave Act ("FMLA").  (King. Aff at ¶ 2.)

Opinski affirmed that he had injured his knee on the job in 2010 and 2012.  (Opinski Aff. at ¶¶ 9–10.)  Opinski took leaves of absence from August 28, 2014, to December 18, 2014, and again from February 12, 2015, to April 8, 2015.  (*Id*. at ¶ 137.)  During this time, Opinski consulted a doctor, who opined that Opinski could begin driving a truck again on April 14, 2015.  (Opinski Dep. at 44–45.)  On April 8, 2015, Opinski returned to JKF on light duty, working twice weekly.  (*Id*. at ¶ 138.)  On April 24, 2015, after two weeks of light duty, he once again injured his knee at work.  (Opinski Aff. at ¶ 11.)  This time, he took a leave of absence and never returned to work.  (Pl.'s Resp. to Def.'s 56.1 at ¶ 136.)  Ferraro terminated Opinski, effective July 9, 2015, "because he had been out for more than 12 weeks within the past year, and J. Kings could no longer hold his job, as the company was short drivers at that time."  (*Id*. at ¶¶ 139–40.)  At that time he had been out of work for 12 weeks and had not been medically cleared to return.  (*Id*. at ¶¶ 143–44.)

## II.     The Instant Dispute

### a.     The Complaint

On December 19, 2017, Quartararo, Keresztes, Barclay, and Opinski filed a complaint against J. Kings Food Service Professionals, Inc. and John King.  That pleading alleges six causes of action, the first four of which are brought on behalf of all defendants.  In the first, plaintiffs argue that they are owed unpaid overtime wages under the FLSA for their work as Ambassadors.  (Compl. at 23–24.)  Plaintiffs claim that defendants' conduct was willful and intentional and that they did not make a good faith effort to comply with FLSA.  (*Id*. at 24.)

7

Plaintiffs also claim that John King was a company principal and therefore personally liable for the conduct of JKF.  (*Id.* at 25.)  In a second cause of action, which relies on the same facts alleged in the first cause of action, plaintiffs allege an entitlement to overtime compensation under the NYLL. (*Id.* at 25–26.)  Under the second cause of action, plaintiffs also allege that JKF failed to keep compensation records as required by New York State law, that their violations were knowing and intentional, and that John King, as CEO of JKF, is personally liable.  (*Id.* at 26.)  As a third cause of action, plaintiffs claim that defendants knowingly, intentionally, and willfully failed to periodically provide statutory wage notices stating the rate and basis of pay, as required by NYLL § 195(1), and that John King is personally liable for this failure.  (*Id.* at 26–27.)  As a fourth cause of action, plaintiffs claim that defendants knowingly, intentionally, and willfully failed to provide accurate wage statements with all requisite contact, wage-rate and wage-basis information, as required by NYLL § 195(3), and that John King is personally liable for this failure.  (*Id*. at 27–28.)

Two plaintiffs also brought individual claims for retaliation against JKF and John King. In a fifth cause of action, Barclay claims that defendants terminated him for taking medical leave to address a clogged artery, in violation of the NYLL § 215.  (*Id*. at 28–29.)  In sixth cause of action, Opinski claims that he was injured while working, and that defendants terminated him when he took medical leave to address the injury, also in violation of the NYLL.  (*Id*. at 30–31.)

### b.    Defendants' Motion for Summary Judgment and Plaintiffs' Opposition and Motion for Partial Summary Judgment

Via a motion filed January 22, 2020, defendants seek summary judgment each of the six causes of action.

As to the plaintiffs' first claim, for overtime pay under the FLSA, defendants argue that Quartararo, Keresztes, Barclay and Opinski were exempt from FLSA's overtime regulations

under the Motor Carrier Act.  (Mot. for Summ. J. at 16.)  They argue that the employees of JKF
were covered by the Motor Carrier Act ("MCA") exemption because JKF fell under the
regulatory jurisdiction of the USDOT.  (*Id*. at 16–17.)  They urge the Court to follow the recent
Supreme Court case of *Encino Motorcars*, which found that FLSA exemptions should not be
construed narrowly but instead be given a "fair reading."  (*Id*. at 18.)  Under this standard, they
argue that the evidence shows that JKF met the two prerequisites for coming under the
jurisdiction of the USDOT.  First, because interstate travel was a "natural, integral, and . . .
inseparable" part of its employees' duties, JKF engaged in interstate commerce.  (*Id*. at 17, 20–
21.)  Second, JKF's employees engaged in "safety-affecting activities . . . including loading,
driving, and delivering goods."  (*Id*. at 19–20.)

On defendants' view of the factual record, interstate travel was a natural, integral, and
inseparable part of the plaintiffs' duties because they could be called upon at any time to drive
interstate.  Crucially, to their view, witnesses described a work assignment system that was
randomized, and that could take any of the plaintiffs out of the state on any given day.  Sandford
affirmed that, as Routing Manager, he

> used a route planning software program from Roadnet. . . . The orders
> would [] be downloaded into the system each day, and the program would set up
> the delivery routes and stops.  [Roadnet] then generated a driver itinerary . . . .
> Because the routing was done on a daily basis, depending on the delivery orders
> for the day, there were no fixed or set "routes" that were driven every day.  As a
> result, I did not assign any specific route to any particular driver.

(Sandford Aff. at ¶¶ 3–4; *see also* Ferraro Aff. at ¶ 38, 40; Sandford Aff. at ¶ 5 (explaining that a
driver could be asked to cover for any other driver); Buscemi Aff. at ¶ 9 (explaining that
Buscemi would assign according to needs of business on a given day.)  Sandford, Ferraro and
Buscemi all explained that none of the plaintiffs ever refused to drive out of state and that they
could have been fired for doing so.  (*Id*. at ¶ 11; Ferraro Aff. at ¶ 42; Buscemi Aff. at ¶ 11.)

9

Moreover, defendants argue that JKF drivers already complied with USDOT regulations, meaning that the Secretary of Transportation could also have extended jurisdiction over them under the MCA exemption.  Apart from the undisputed record, which showed extensive USDOT oversight of JKF's trucking operations, Ferraro testified that, during the relevant time period, JKF was a motor carrier registered with, and regulated by the FMCSA, a branch of the USDOT, and that JKF had operating authority to transport goods in interstate commerce.  (Ferraro Aff. at ¶ 16; *see also id*. at ¶ 17 (explaining that registration was mandatory for JKF).)  Thus, according to Ferraro, all drivers including plaintiffs had to follow the safety mandates of the FMCSA. (Ferraro Aff. at ¶ 23 (drivers required to list past accidents and undergo USDOT background check).)  Additionally, Ferraro and Buscemi affirmed that all drivers are provided with a copy of the FMCA regulations upon hire, and Ferraro claimed that JKF required all employees to familiarize themselves with these regulations. (Ferraro Aff. at ¶ 34; Buscemi Aff at ¶ 8; *see also* Def.'s Ex. 27 (Doc. No. 50-11); Ferraro Aff. at ¶ 35–36 (all employees provided with a USDOT Fleet Safety Program and required to comply); Def.'s Ex. 28 (Doc. No. 50-12); Def.'s Ex. 29 (Doc. No. 50-13).)

As to the second cause of action, defendants claim that New York State law incorporates the FLSA's exemptions for transportation workers, and thus the Court should also dismiss the overtime claim arising under the NYLL.  (*Id*. at 22.)  As to the third claim, regarding deficient wage notices under the NYLL, defendants argue that the wage notice requirements of NYLL § 195(1) did not come into effect until April 9, 2011.  (*Id*. at 23.)  Defendants argue that because the record shows that Quartararo, Keresztes, Barclay, and Opinski began employment with JKF in 2002, 1999, 1997 and 1997 respectively, NYLL § 195(1) does not apply.  (*Id*. at 23.)  They also note that plaintiffs did receive such notices in 2013 and 2014.  (*Id*.)  As to the fourth cause

of action, defendants argue that plaintiffs failed to adduce evidence of any deficiencies in their pay statements under NYLL § 195(3).  (*Id*. at 24.)  In any case, the NYLL provides a complete defense where, as here, plaintiffs allege only a technical violation, but the employer has timely paid all required wages.  (*Id*.)  Moreover, since they were not required to pay overtime, plaintiffs cannot base their claim on the absence of overtime pay information.  (*Id*. at 24–25.)

As to the fifth cause of action, for retaliation under the NYLL against Barclay, defendants argue that Barclay has failed to adduce evidence that he complained about a violation of the NYLL and has failed to adduce evidence of a causal connection between any complaint and his termination, as required to state a claim for retaliation.  (*Id*. at 26–27.)  Even if Barclay could state a claim, JKF had a legitimate reason for terminating him, as he had exhausted his leave under the FMLA, leaving the company short on drivers.  (*Id*. at 27.)

Likewise, as to the sixth claim – alleging retaliation against Opinski – defendants argue that Opinski has failed to adduce evidence that he complained of a violation of the NYLL, nor does the record show a causal connection between any complaint and the termination.  (*Id*. at 27–28.)  Moreover, JKF had a legitimate business reason for terminating Opinski, in that he had been absent for twelve weeks in the year prior to April 2015 when he was terminated, and JKF could no longer hold his job.  (*Id*. at 28.)  Finally, the sixth cause of action is time-barred.  (*Id*.)

On January 22, 2020, plaintiffs opposed defendants' motion for summary judgment and cross-moved for partial summary judgment on their FLSA and NYLL overtime causes of action. (Opp'n and Cross Mot. (Doc. No. 57).)  As to their first cause of action for overtime under the FLSA, arguing that Quartararo, Keresztes, and Barclay did not qualify for the MCA's exemption to the FLSA because they only rarely drove outside of New York, because their deliveries began and terminated within New York State, and because the goods transported were not part of a

continuous flow of goods in interstate commerce.  (*Id*. at 14–15.)  They therefore fail the first prong of the MCA exemption, that the employee be engaged in interstate commerce.  (*Id*.)

On plaintiffs' view of the record, only certain drivers at JKF would regularly drive interstate.  (*Id.* at 14.)  The undisputed record shows very few interstate trips for Barclay and Keresztes, and none for Quartararo.  In addition, Buscemi testified that only certain drivers would drive out of state, but none of the plaintiffs were in this group.  (Buscemi Dep. at 112:16-112:18.)  Quartararo testified that had he "been assigned to rescue another driver making an out-of-state delivery for J. Kings, he probably would have to quit."  (Pl.'s Resp. to Def.'s 56.1 at ¶ 111; Quartararo Dep. (Doc. No. 60-3) at 150:5–7; *see also* Quartararo Aff. at ¶ 6 (affirming that he spent 90% of his time driving within Suffolk County); Sandford Dep. (Doc. No. 60-8) at 23:12–17) (Quartararo's route confined to Huntington).)  Barclay likewise affirmed that JKF expected him to drive entirely within Brooklyn, that "nearly" all drivers drove the same daily route, and that he never expected to drive out of state.  (Barclay Aff. at ¶ 4; *see also* Sandford Dep. at 23:20–21 (Barclay's route confined to Brooklyn).)  Keresztes likewise affirmed that his route was confined to Manhattan, and that he expected to drive this route daily.  (Keresztes Aff. at ¶ 4; *see also* Sandford Dep. at 98:5–7 (Keresztes could expect to drive in New York on any given day).)

Cezary Paduch, who was a routing supervisor for a period of less than a year spanning 2015–2016, described the drivers' daily routes similarly.  (Paduch Dep. (Doc. No. 60-7) at 73:6–73:21 (Quartararo only received Nassau County routes, and Barclay only received Brooklyn and Manhattan routes).)  In general, he sent each driver on the same route each day.  (*Id*. 70:13–72:20; *see also id*. at 74:18–77:14; 60:9–61:3 (drivers could expect same daily routes).)

Plaintiffs support their view with testimony that the drivers were expected to fulfill a customer service function as "ambassadors" in addition to simply making deliveries.  Thus, JKF would try to assign them to the same customers every week, meaning that those drivers on intrastate routes would expect to remain on their intrastate routes with the same customers. Sandford, for instance, testified that he heard drivers referred to as "ambassadors" and heard references to "ambassador service."  (Sandford Dep. at 13:20–25, 14:2–4; *id*. at 18:6–16 (describing customer service function of ambassadors); Buscemi Dep. at 103:15–24 (discussing "Ambassador service"); *see also* Def.'s Resp. to Pl.'s 56.1 at ¶ 6 ("Ambassador Service" embroidered on uniforms).)

As to defendants' evidence of regulation by the USDOT, plaintiffs have submitted into evidence a screenshot of the USDOT website purporting to show that JKF is "not authorized" to operate interstate.  (Pl.'s Ex. T (Doc. No. 61-7).)  Moreover, though some plaintiffs signed some USDOT-required paperwork, compliance was not truly expected.  (Quartararo Dep. at 83:1–83:8l; Opinski Dep. at 88:2–88:14 (Quartararo and Opinski testifying that JKF never gave them copy of USDOT safety regulations); *see also* Quartararo Dep. at 85:15–86:18; Opinski Dep. at 91:4–91:12; Barclay Dep. (Doc. No. 60-1) at 173:9–174:14 (Quartararo, Opinski, Barclay, testifying that they did not read the safety program).)  Thus, in sum, interstate was not a natural, integral and inseparable part of plaintiffs' work.

Next, plaintiffs argue that, since defendants' arguments as to the MCA fail, and because it is not disputed that JKF did not pay them overtime, Quartararo, Keresztes, and Barclay are entitled to summary judgment on the issue of FLSA overtime.  (*Id*. at 15.)  Opinski concedes that he sometimes drove outside of New York, but that the MCA exemption does not apply to any individual weeks where he did not drive outside of New York.  (*Id*. at 15–16.)  Defendants

therefore fail to satisfy the first prong of the MCA as to those weeks, and the Court should enter summary judgment for Opinski to the effect that a week-by-week analysis is appropriate, with the final amount of overtime pay to be calculated based on evidence at trial.  (*Id*. at 16.)

As to the second cause of action, for overtime under the NYLL, plaintiffs agree that NYLL overtime is analyzed in the same way as FLSA overtime, and therefore they are entitled to overtime under the NYLL as well.  (*Id*. at 18.)

The plaintiffs do not seek summary judgment on the other claims, but only oppose defendants' motion.  As to their third cause of action, plaintiffs argue that the wage notice requirements of NYLL § 195(1) applied to them even though they were hired after April 9, 2011, because the law required that the notice be sent to existing employees whenever their wage rate changed.  (*Id*. at 18–19.)  In addition, between 2011 and 2015, the law required that wage notices be sent annually.  (*Id*. at 19.)  As to their fourth cause of action, plaintiffs claim the paystubs required by NYLL §195(3) failed to include the number of hours worked by plaintiffs, as required by statute.  (*Id*. at 19.)  These paystubs should also have contained overtime wages.  (*Id*.)  Defendants have thus failed to establish that there is no triable issue of fact.  (*Id*.)

Finally, Barclay and Opinski argue that they have adduced sufficient evidence for their retaliation claims, the fifth and sixth causes of action respectively, to survive summary judgment.  (*Id*. at 19–20.)  Barclay and Opinski "agree that NYLL § 215 controls the retaliation claims."

Barclay argues that he made a request for reasonable accommodations when he requested fewer working hours and a changed workload, and that JKF retaliated against him by terminating him while he was out on sick leave.  (*Id*. at 20–21.)  Opinski also argues that he requested accommodation and was terminated for doing so.  (*Id*. at 21–22.)

14

In their opposition to plaintiffs' motion for partial summary judgment, JKF reiterates that there is no dispute that JKF "is a commercial distributor of food items throughout the country," registered for interstate commerce with the USDOT, where drivers could be called on at any time to drive interstate.  (*Id*. at Def.'s Mem. in Opp'n to Pl.'s Mot. for Part Summ. J. (Doc. No. 66) at 8–17.)  JKF's drivers thus fall under the jurisdiction of the Secretary of Transportation. Defendants also argue that the week-by-week analysis plaintiffs suggest should apply to Opinski has not been adopted by the Second Circuit, and that week-by-week analysis does not apply where, as here, interstate travel is a "natural, integral and . . . inseparable part" of employees' duties.  (*Id*. at 17–18.)  Finally, defendants reiterate that plaintiffs are applying the wrong standard to their analysis of the FLSA exemptions.  (*Id*. at 18–19.)  They rely on older cases where FLSA exemptions were to be construed narrowly, but the Supreme Court, as of 2018, requires that such exemptions be given a "fair reading" instead.  (*Id*. at 19.)

## DISCUSSION

### I.    Standard of Review

Summary judgment is appropriate when the pleadings, depositions, interrogatories, and affidavits demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A fact is "material" if it may impact the "outcome of the suit under the governing law."  *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson*, 477 U.S. at 248).

In determining whether a genuine issue of material fact exists, the evidence of the non-movant "is to be believed," and the Court must draw all "justifiable" or reasonable inferences in favor of the non-moving party.  *Anderson*, 477 U.S. at 255 (citation omitted); *see also Rodriguez v. City of New York*, 72 F.3d 1051, 1061 (2d Cir. 1995) ("[T]he court is to draw all factual inferences in favor of the party against whom summary judgment is sought, viewing the factual assertions ... in the light most favorable to the party opposing the motion." (citations omitted)).

Once the moving party has demonstrated that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, "the nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*"  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted) (citation omitted); *see also Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (collecting cases and stating that the non-moving party "may not rely on conclusory allegations or unsubstantiated speculation").  In other words, the non-movant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor."  *Anderson*, 477 U.S. at 256.

## II.     The MCA Exemption and Plaintiffs' Entitlement to Overtime Pay

Both parties have moved for summary judgment on the applicability of the Motor Carrier Act exemption.  The Court finds that there remains a genuine dispute of material fact as to whether the Secretary of Transportation had jurisdiction over plaintiffs Barclay, Keresztes and Opinski, but that Quartararo has demonstrated that there is no genuine dispute as to his overtime claim.

### a.     Statutory Framework

The Motor Carrier Act exempts from the FLSA's overtime provisions: "(1) any employee with respect to whom the Secretary of Transportation has power to establish qualifications and

maximum hours of service pursuant to the provisions of section 31502 of Title 42." 29 U.S.C. § 213(b)(1). Under section 31502 of Title 42, "[t]he Secretary of Transportation may prescribe requirements for . . . (2) . . . a motor private carrier, when needed to promote safety of operation." 49 U.S.C. § 13501(1) limits the jurisdiction of the Secretary to "transportation by motor carrier" between states, and between "a State and another place in the same State through another State."

The parties do not dispute that JKF, as a food distributor, is a motor private carrier, which is defined as a carrier that moves goods or property in furtherance of a commercial enterprise. 49 U.S.C. § 13102(15). Nor is there a dispute about whether the Secretary would be able to regulate the plaintiffs "to promote safety of operation," because the work of a driver has been held to affect safety, and plaintiffs were clearly "drivers." *See Morris v. McComb*, 332 U.S. 422, 430 (1947); *accord Dauphin v. Chestnut Ridge Transp., Inc.*, 544 F. Supp. 2d 266, 274 (S.D.N.Y. 2008) (applying the exemption to drivers); *see also* 49 C.F.R. § 390.5 ("Driver" defined as "any person who operates any commercial motor vehicle.") Accordingly, the sole issue before the Court is whether JKF falls into the interstate commerce jurisdiction of the Secretary of Transportation.

**b.      The Interstate Commerce Jurisdiction of the Secretary of Transportation**

The MCA exemption applies where the Secretary of Transportation has jurisdiction, regardless of whether he has actually exercised his power. *See* 29 C.F.R. § 782.1(a) (2004); *Bilyou v. Dutchess Beer Distrib., Inc.*, 300 F.3d 217, 222 (2d Cir.2002). The exemption will apply even though the Secretary has not asserted regulatory powers, because Congress intended in the MCA exemption to preserve the authority of the Department of Transportation to regulate the hours of motor vehicle operators without overlapping the FLSA's overtime provisions. *See*

17

*Dauphin v. Chestnut Ridge Transportation, Inc.*, 544 F.Supp.2d 266, 271 (S.D.N.Y.2008);

*Masson v. Ecolab, Inc.*, No. 04-CV-4488 (MBM), 2005 WL 2000133, at *5 (S.D.N.Y. Aug. 17,

2005).

### 1.    The Applicability of *Encino Motorcars*

Defendants bear the burden of proving that the MCA exemption applies.  *Bilyou* 300 F.3d

at 229.  Plaintiffs argue that the MCA, as an exemption to the FLSA, must be "narrowly

construed against the employers . . . [and its] application limited to those establishments plainly

and unmistakably within [its] terms and spirit."  *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388,

392 (1960); *accord Gutierrez Chacon v. P & S Select Foods, Inc.*, No. 17-CV-1037 (ER), 2019

WL 6170423, at *3 (S.D.N.Y. Nov. 19, 2019) (applying the standard to a defendant-employer's

claimed MCA exemption).  However, as defendants point out, the Supreme Court has recently

held that exemptions to the FLSA should not be read narrowly but, rather, should be given a "fair

reading."  *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018); *accord Munoz-*

*Gonzalez v. D.L.C. Limousine Serv.*, Inc., 904 F.3d 208, 213 (2d Cir. 2018) (applying *Encino,*

and holding that hired limousine drivers could fall under the FLSA's taxicab exemption).

*Encino* and accordant cases stand for the proposition that an interpreting court should not simply

construe exemptions narrowly, but should consult dictionaries contemporary to the statute, as

well as general usage, for instance by Congress, courts and legislatures, to determine the

ordinary meanings of the terms employed.  *See Munoz-Gonzalez*, 904 F.3d at 213.  The

implication is that the standard is now more employer-friendly, because it no longer requires a

narrow reading of exemptions.

But, taking *Encino* at its face value, it does not alter the standard that has always applied

to interpretation of the MCA.  That is because this interpretation has always depended upon a

handful of cases from the 1940's, nearly contemporaneous to the 1935 passage of the MCA. *See Morris v. McComb*, 332 U.S. 422 (1947); *Levinson v. Spector Motor Service*, 330 U.S. 649 (1947); *Pyramid Motor Freight Corp.*, 330 U.S. 695 (1947); *Southland Gasoline Co. v. Bayley*, 319 U.S. 44 (1943). Key amongst these to the present case is *Morris v. McComb*, in which the Court wrote of a carrier where only some drivers moved goods in interstate commerce part of the time:

> [A]pparently in the normal operation of the business, these strictly interstate commerce trips were distributed generally throughout the year and their performance was shared indiscriminately by the drivers and was mingled with the performance of other like driving services rendered by them otherwise than in interstate commerce. These trips were thus a natural, integral and apparently inseparable part of the common carrier service of the petitioner and of his drivers.

*Morris v. McComb*, 332 U.S. 422, 433 (1947). Using this standard, the *Morris* Court applied the MCA to two employees who themselves made no trips in interstate commerce during the one-year period in question, because they were subject to being assigned to make such trips. *See id.*; *accord* Application of the Federal Motor Carrier Safety Regulations, 46 Fed. Reg. 37,902–03 (Dep't of Transp. July 23, 1981) (interpreting the MCA exemption as applying to any driver subject to being assigned an interstate trip and who has a reasonable expectation of being so assigned); *Fox v. Commonwealth Worldwide Chauffeured Transp. of NY, LLC*, 865 F. Supp. 2d 257, 266 (E.D.N.Y. 2012) (applying *Morris*). This is a flexible standard that has not been construed over-narrowly. *See Morris*, 332 U.S. at 439 (Murphy, J., dissenting) (arguing that the *Morris* majority gave the MCA exemption an overbroad reading by applying it to employees with no record of actual interstate trips). Because it is a statement of law contemporaneous to the passage of the statute, and because it is already a broad holding, *Morris* complies with the "fair reading" standard of *Encino* and remains the authoritative statement of the law in this area.

Instead of looking solely at an employee's driving schedule, *Morris* requires a "fact-specific analysis" of the employer's practices, to determine the "character of interstate driving . . . , including an examination of the method by which the employer assigns the interstate activity to the pertinent class of employees, the nature of the employer's business, and perhaps to a lesser degree, the proportion of interstate-to-intrastate employee activity." *Masson*, 2005 WL 2000133, at *9 (internal quotation marks omitted); *see, e.g., Dauphin v. Chestnut Ridge Transp., Inc.*, 544 F. Supp. 2d 266, 275–76 (S.D.N.Y. 2008) (declining to apply the MCA exemption on summary judgment, where the record was conflicted on how often any given driver in a pool would be called upon to drive across state borders, and the employer had not established how its routes would be assigned).  A company's compliance with other USDOT regulations, such as vehicle registrations, often weighs in this analysis.  *See, e.g., D'Arpa v. Runway Towing Corp.*, No. 12-CV-1120, 2013 WL 3010810, at *10 (E.D.N.Y. June 18, 2013) (finding for purposes of deciding a summary judgment motion that, absent any other evidence of interstate activity, an employer's registration with the USDOT as an "intrastate" carrier meant that the employer had not produced evidence sufficient to survive employee's summary judgment motion); *Resch*, 785 F.3d at 874 (finding, for purposes of deciding a summary judgment motion, that an employer's USDOT registration was probative of the inquiry into the "nature of the employer's business" under *Morris*).

### 2.    Applicability of the Week-by-Week Rule

Opinski urges the Court to apply the "week-by-week" rule to his driving record.  The rule originates in a certain Department of Labor regulation.  The relevant DOL regulation establishes a *de minimis* exception to the MCA exemption, for employees whose sporadic activities affecting safety in interstate commerce are "trivial, casual, and insignificant."  29 C.F.R. § 782.2(b)(3).

Second, it states that, where the employee's overall interstate safety-affecting activities are *de minimis*, the exemption will apply only in any week where the employee actually works in such a role. *See id.* These regulations are sometimes read, and plaintiffs read them as saying, that, regardless of their overall duties, an employee should only be exempted from the FLSA during weeks when they actually drive interstate. However, this is a misreading of the "week-by-week" rule, which only applies where the interstate duties of the plaintiff are found *de minimis* overall.

### 3.      Whether to Analyze the Drivers as a Pool or on an Individual Basis

Finally, *Morris* raises an issue about the propriety of applying the MCA exemption on an employee-by-employee basis. The Court in *Morris* was not faced with an argument about individual employees. *See Morris*, 322 U.S. at 434. Instead, the employees had argued that *none* of the operations of the common carrier should be held to fall under the jurisdiction of the Secretary. *See id*. The Court, noting that the plaintiffs had not presented arguments about individual plaintiffs, ruled narrowly on the issue presented. *See id*. Some Courts have thus discussed the propriety of analyzing employees on an individual basis, since it is an issue that *Morris* left open. *See, e.g., Walters v. Am. Coach Lines of Miami, Inc.*, 569 F. Supp. 2d 1270, 1286–87 (S.D. Fla. 2008), *aff'd*, 575 F.3d 1221 (11th Cir. 2009) (analyzing a pool of interstate drivers separately from a pool of intrastate drivers); *Dole v. Circle "A" Const., Inc.*, 738 F. Supp. 1313, 1319 (D. Idaho 1990) (The MCA is an "'employee' based exemption.").

Nothing in *Morris*, nor in any holding of the Second Circuit, suggests that such an employee-by-employee analysis is inappropriate. But *Morris* requires the Court to refrain from deciding a motion on an employee-by-employee basis where a movant only asks the Court to apply it to an entire pool of employees.

21

c.      **Analysis**

1.      **Defendants' Entitlement to Summary Judgment as to the Entire Pool of Drivers**

Defendant urges summary judgment on the basis that *Morris* applies to all of the plaintiffs, because all of them were on call at all times to drive interstate and therefore under the jurisdiction of the Secretary of Transportation at all times relevant to the complaint.  The Court finds that JKF has not established beyond genuine dispute that *Morris* applies to the entire pool of drivers.  The Court examines the factors other courts have found probative of whether interstate driving was "natural, integral and indispensable:" (1) the proportion of interstate-to-intrastate activity; (2) the nature of the employer's business, including regulation by the USDOT; and (3) the method by which the employer assigns the interstate activity to the pertinent class of employees.

First, it is undisputed that JKF moved goods in interstate commerce as a significant part of its business.  12% of its revenue came from deliveries out of state in the period from 2011 to 2017, with an average of between 15.2% to 37.5% of JKF's deliveries going to New Jersey, Connecticut, and Massachusetts on any given day.  78% of all drivers went out of state at some point during their employment.  JKF's managers testified that employees could be subjected to discipline for failing to accept an interstate route.

Second, the USDOT asserted regulatory jurisdiction over JKF as a whole, at least as to certain safety requirements.  JKF maintained a registration number for operating authority to transport goods interstate, and in 2009 the FMCSA cited JKF for a violation.  Between 2016 and 2018, the FMCSA conducted 153 roadside driver inspections to check for compliance with USDOT regulations.  JKF also required its employees to comply with various USDOT driver regulations, including certifying medical fitness to drive interstate, among many others.  Each of

the plaintiffs were subject to these requirements.  Even Quartararo, for whom defendants have adduced no evidence of any interstate travel at all, was subject to inspections, and understood that the USDOT could flag his vehicle for safety violations.

However, the Court is aware of no precedents treating the Secretary's regulation of safety, or the lack of such regulation, as dispositive on the question of the Secretary's interstate commerce jurisdiction.  An employer may seek interstate authority, or require employees to comply with USDOT safety regulations, based on an intent to engage in interstate transportation at some time in the future.  As discussed, the inquiry centers upon whether and for what periods the employees were on call to drive interstate.  Compliance with federal safety regulation is factually persuasive on this question but does not by itself permit a grant of summary judgment.

As for JKF's system of assigning interstate trips, there is clear evidence, undisputed by plaintiffs, that all of the plaintiffs except Quartararo in fact made interstate deliveries at some point during their employments.  Opinski did so on a regular basis, at least for the period in 2014–2015 where the record is undisputed.  Dispatchers Buscemi and Sandford both testified that they could ask any driver to drive interstate on any given day, according to the needs of the business.

However, the record on this point does not permit summary judgment.  First, the most compelling portion of the undisputed record is incomplete.  For instance, the delivery data for Opinski in exhibit 33 shows indisputably that, for a period in 2014–2015, he could be called upon at any time to drive interstate.  This covers only a small portion of the period in controversy, and defendant has not adduced any such evidence for the other periods at issue. The problem is even more pronounced for Quartararo, for whom no evidence of interstate driving has been adduced, and for Barclay and Keresztes, for whom only minimal evidence has

been adduced.  JKF's evidence is simply not of the scope and quality required to take this issue out of dispute.

Moreover, there is ample evidence that JKF did not assign interstate routes indiscriminately to all of its drivers.  Each plaintiff has testified that their regular routes were purely intrastate and that they had no expectation of driving interstate on any given day.  Paduch, a former dispatcher at JKF, testified that only certain drivers had regular interstate routes.  There is also significant evidence from which a juror could infer that these routes were fixed and recurring, in that drivers were called upon to perform significant customer service work as "ambassadors."

The evidence on this point is especially compelling as to Quartararo.  There is no evidence that he ever drove interstate.  Paduch testified that his route was confined to Long Island; he testified that he would have quit if ever asked to drive outside of New York.  Barclay and Keresztes both likewise testified that their regular routes were confined to New York.

Because a juror could infer from plaintiffs' evidence that JKF assigned interstate routes only to certain drivers, it cannot be said that the evidence establishes beyond any dispute that this is a case, as in *Morris*, where a pool of drivers could expect to be assigned interstate routes at any time.

### 2.    Plaintiffs' Entitlement to Summary Judgment as to Individual Employees

Plaintiffs move for summary judgment for each plaintiff individually.  Quartararo has proven an entitlement to summary judgment, but Barclay, Keresztes and Opinski have not.

Based on the evidence about JKF's policy of assigning trips, its compliance with USDOT regulations, and the evidence of actual interstate trips as to Barclay, Keresztes, and Opinski, a juror could find that the MCA exemption applied to them.

As to Opinski, he admits that he often drove interstate at JKF's request, but he asks the Court to grant summary judgment as to those weeks he remained within New York. However, this argument depends upon a misreading of the Department of Labor regulation, which does not apply until a driver's interstate duties are already *de minimis*. Opinski's interstate driving duties were not *de minimis*. For the period where the record is clear, he constantly drove out of state, and the record could lead a factfinder to the conclusion that he was on call to drive interstate even during those weeks when he actually remained within New York.

However, a factfinder could not find that Quartararo was on call to drive interstate at any time. It is true that Quartararo complied with various USDOT regulations for interstate drivers at the request of JKF and was even inspected by USDOT inspectors during his employment, facts which potentially evince an intent on the part of JKF to employ Quartararo on an interstate route. However, Quartararo's is a case distinguishable from *Morris*, in that his record of actual journeys leaves no room for dispute. Defendants have not adduced evidence of a single trip – over 14 years of employment – that Quartararo took out of state, and the evidence is otherwise overwhelming that he expected on any given day to do duty solely within Suffolk County. It would be stretching the holding of *Morris* too far to suppose that an employer who ever (in good faith) intended to send a driver over state lines would fail to do so over the entirety of a 14-year long career.

Finally, Keresztes, and Barclay argue that they did not transport goods involved in a "practical continuity of movement in the flow of interstate commerce" because they transported goods only from one location within New York to another. *Bilyou v. Dutchess Beer Distributors, Inc.*, 300 F.3d 217, 224 (2d Cir. 2002) (citation omitted). "The intent at the time transportation commences 'fixes the character of the shipment for all the legs of the transport

within the United States.'" *Id.* at 300 F.3d at 224 (quoting *Project Hope v. M/V Ibn Sina*, 250

F.3d 67, 75 (2d Cir. 2001)).  Defendants do not dispute this point and the parties have not

developed the record enough to resolve it.  There is no evidence one way or the other regarding

the intent of the parties who originally shipped the goods.  This prong of plaintiffs' cross-motion

is also unripe for summary judgment.

## III.    NYLL Overtime

"The same MCA exemption applicable under the FLSA also applies under the NYLL."

*Chaohui Tang v. Wing Keung Enterprises, Inc.*, 210 F. Supp. 3d 376, 390 (E.D.N.Y. 2016)

(citing 12 N.Y.C.R.R. § 142–2.2); s*ee Fox v. Commonwealth Worldwide Chauffeured Transp. of*

*NY, LLC*, 865 F. Supp. 2d 257, 268 (E.D.N.Y. 2012).  Therefore, for the same reasons as

described in II, there remains a genuine dispute of material fact as to plaintiff's overtime claims

under the NYLL, except as to Quartararo.

## IV.    Whether JKF Provided the Plaintiffs with § 195 Notices

On this point, because plaintiff has not adduced any evidence that a relevant cause of

action under New York law existed during their employments, no genuine dispute of material

fact exists.

Under Section 195 of the NYLL, an employer must provide to each employee at their

hiring a notice containing accurate information about, among other things, "the rate or rates of

pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or

other."  N.Y. Lab. Law § 195(1)(a).  Employers must obtain written confirmation of receipt from

the new hire.  *Id*.  Section 195(2) requires that employers provide pre-existing employees seven

days' notice of any changes to the wage information set forth in 195(1)(a).

> Beginning April 9, 2011, [195] required employers to provide written
> wage notices "at the time of hiring, and on or before February first of each

> subsequent year of the employee's employment with the employer." N.Y. Lab.
> Law § 195(1-a) (eff. Apr. 9, 2011 to Feb. 27, 2015). By an amendment . . .
> effective February 27, 2015, that provision changed to require employers to
> provide written wage notices only "at the time of hiring." 2014 N.Y. Laws ch. 537
> § 1, amending N.Y. Lab. Law § 195(1-a).

*Cabrera v. Canela*, 412 F. Supp. 3d 167, 184 (E.D.N.Y. 2019).  Therefore, from 2011 until 2015,

the NYLL required employers to provide wage notices (1) at the time of hiring, (2) once a year,

and (3) whenever the rate or timing of pay changed.  *See id*.  After 2015, the law required

notifications only at the time of hiring and upon changes to pay rate or timing.  *See id*.   Since

each of the plaintiffs began their employment well before 2011, they are not entitled to any

money damages for JKF's failure to provide notices upon hiring.

Although there is evidence that defendant failed to provide the annual notices that were

required between 2011 and 2015, plaintiffs do not have a private cause of action for this failure.

NYLL § 198, which describes the remedies for violations of section 195, did not furnish a

private cause of action for the annual wage notice, rendering it, on one view, "a law without a

remedy."  *Gamero v. Koodo Sushi Corp.*, 272 F. Supp. 3d 481, 510 n.13 (S.D.N.Y. 2017), *aff'd*,

752 F. App'x 33 (2d Cir. 2018); *see also* Labor Law—Wage Theft Prevention Act, 2010 Sess.

Law News of N.Y. Ch. 564, §1-b (S. 8380) (McKinney's) (describing government enforcement

of Section 195).  Accordingly, plaintiffs cannot recover for defendants' failure to provide the

annual wage notices.

The sole remaining issue is whether New York law provided during any period relevant

to this case a cause of action for lack of notice of wage change.  There is some authority that the

wage-change notice requirement created a private cause of action.  *See Cuzco v. F & J Steaks*

*37th St. LLC*, No. 13-CV-1859 (PAC), 2014 WL 2210615, at *4 (S.D.N.Y. May 28, 2014);

*accord Ik Ho Choi v. Home & Home Corp.*, No. 17-CV-05400 (ARR) (SMG), 2019 WL

4193449, at *6 (E.D.N.Y. Sept. 3, 2019); *Perez v. Platinum Plaza 400 Cleaners, Inc.*, No. 12-CIV-9353 (PAC), 2015 WL 13402755, at *5 (S.D.N.Y. June 16, 2015).  However, just as its plain text provides no cause of action for violations of the annual notice requirement, Section 198 contains (and contained) no cause of action for a violation of the wage-change notice provision of 195(2).  *See* Labor Law—Wage Theft Prevention Act, 2010 Sess. Law News of N.Y. Ch. 564, §1-b (S. 8380) (McKinney's); *see Dowd v. 6675 Transit Rd LLC*, No. 16-CV-1006V (SR), 2017 WL 5713956, at *4 (W.D.N.Y. Oct. 23, 2017), *report and recommendation adopted*, No. 16-CV-1006, 2017 WL 5675828 (W.D.N.Y. Nov. 27, 2017) (plain reading of the statute leads to conclusion that there was no cause of action for an employer's failure to provide notice of a change in wage or wage rate.)

The Court need not decide this issue because plaintiffs have not, in any case, adduced any evidence from which a juror could infer that the wage or basis of pay of any of the plaintiffs changed in the period after 2010.  There is evidence that JKF switched its drivers to a day rate in July 2010. (Opinski Aff. at ¶ 8) (affirming that this change occurred in July 2010).  Nowhere do plaintiffs allege any subsequent changes that would have triggered Section 195(1) requirements, nor does the record show that any such changes occurred.  Although plaintiffs claim in their motion that the change to a day rate occurred in 2012, (Pl.'s Mot. for Part. Summ.J. at 19), this assertion comes out of the blue and has no support in the record.  There is therefore no genuine dispute of material fact that the wage notice requirements of 195(1) do not apply to this case.

## V.	Failure to Provide Accurate Paystubs Under 195(3)

New York law requires that employers

furnish each employee with a statement with every payment of wages, listing the following: the dates of work covered by that payment of wages; name of employee; name of employer; address and phone number of employer; rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary,

piece, commission, or other; gross wages; deductions; [and] allowances, if any, claimed as part of the minimum wage.

N.Y. Lab. Law § 195(3).  Unless New York State law or regulation provides for an exemption, "the statement must also include the regular hourly rate or rates of pay; the overtime rate or rates of pay; the number of regular hours worked, and the number of overtime hours worked."  *Id*. Section 198 of the NYLL provides a complete defense for a deficient wage statement where the employer makes "complete and timely payment of all wages due."  N.Y. Lab. Law § 198(1-d).

Since, as discussed, *supra*, Section III, the NYLL provides for the same MCA exemption as the FLSA, whether the statements should have included overtime pay cannot be decided at this time.  If the exemption did not apply, then the wage notices were deficient for failing to describe overtime hours and overtime rate of pay, and if it did apply, then the statements were not deficient for failing to describe overtime hours.  For the same reasons, defendants cannot establish their entitlement to summary judgment on the complete defense provided by 198(1-d).

However, defendants have argued that they are otherwise entitled to summary judgment, because plaintiffs have not adduced any evidence from which a juror could infer that the statements were deficient except regarding overtime.  However, there is still a dispute of fact, as to these wage statements.

The paystubs provided from between 2014 and 2016 for each of the plaintiffs each contain (1) the dates of work covered by that payment of wages, which were paid at one-week intervals; (2) the name of the employee; (3) the name of the employer, JKF; and (4) the address and phone number of JKF, which was found in the footer; and (5) the rate or rates of pay, being $240.00 for Barclay, Keresztes, and Opinski, and $256.00 for Quartararo.  They also clearly include (7) gross wages and (8) applicable deductions.  However, these paystubs are unclear as

to (6) the basis of pay, *i.e.*, whether paid by the hour, shift, day, week, salary, piece, commission, or other.  That is because they list the number of days in the pay period under the column designated "hours."

Either because the day rate was improperly listed as an hourly rate, or because JKF failed to include an hourly rate with overtime, there is a genuine dispute of material facts as to whether these statements accurately listed the hours worked and the basis of pay.[2]

## VI.    Retaliation Claims

Barclay and Opinski have failed to raise a genuine dispute of material fact as to their retaliation claims.  NYLL § 215 provides a cause of action when an employer "discharge[s], threaten[s], penalize[s], or in any other manner discriminate[s] or retaliates against any employee" for the following reasons, in pertinent part:

> (i) because such employee has made a complaint to his or her employer, . . . or any other person, that the employer has engaged in conduct that the employee, reasonably and in good faith, believes violates any provision of this chapter, . . . (ii) because such employer or person believes that such employee has made a complaint to his or her employer, . . . or to any other person that the employer has violated any provision of this chapter . . . (iii) because such employee has caused to be instituted or is about to institute a proceeding under or related to this chapter, . . . (vi) because such employee has otherwise exercised rights protected under this chapter, or (vii) because the employer has received an adverse determination from the commissioner involving the employee.[3]

N.Y. Lab. Law § 215(1)(a).  In this statute, the repeated use of "this chapter" "refers to any provision of the Labor Law."  *Epifani v. Johnson*, 882 N.Y.S.2d 234, 235 (2d Dep't 2009) (citations and internal quotations omitted).  "An employee complaint or other communication

---

[2] Quartararo's statements should have, of course, included overtime, but Quartararo did not seek summary judgment on this point.

[3] The elided sections have to do with complaints to, and orders by, the Commissioner of Labor of the State or the State Attorney General.  No such order or complaint is at issue here.

need not make explicit reference to any section or provision of [the NYLL] to trigger the protections of this section." N.Y. Lab. Law § 215(1)(a).

> To establish a prima facie case of retaliation under this provision, a plaintiff must be able to show that, while employed by the defendant, he or she made a complaint about the employer's violation of New York Labor Law and was terminated or otherwise penalized, discriminated against, or subjected to an adverse employment action as a result. Further, there must be "a nexus between the employee's complaint and the employer's retaliatory action." Once the plaintiff establishes a prima facie case of retaliation under Section 215, the burden shifts to the defendant to produce evidence suggesting that it had a legitimate, non-retaliatory explanation for its actions. The plaintiff must then persuade the finder of fact that the proffered explanation is pretextual.

*Esmilla v. Cosmopolitan Club*, 936 F. Supp. 2d 229, 238–39 (S.D.N.Y. 2013) (internal citations and quotations omitted).

Barclay and Opinski argue that JKF terminated them because of their requests for reasonable accommodation. However, this claim fails the first element of the prima facie case under NYLL § 215, because a request for accommodation owing to disability is not an employment action protected by the New York Labor Law. Disability discrimination and retaliation for complaints of discrimination are instead covered by the New York State Human Rights Law, § 296(1)(a). *See* 296(3)(a) (unlawful discrimination to refuse to make reasonable accommodations for disability); 296(7) (retaliation).

Since Barclay and Opinski concede that their claim arises under NYLL § 215, and because the NYLL provides no cause of action for an employer's failure to make a reasonable accommodation, there is no genuine dispute of material facts regarding retaliation against Barclay and Opinski for their requests for accommodation.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is denied in part and granted in part. The Court denies summary judgment on both the FLSA and NYLL

overtime claims.  The Court also denies the defendants' motion for summary judgment as to plaintiffs' claim under NYLL § 195(3), for paystub violations.  The Court grants defendants' motion for summary judgment as to plaintiffs' claim under 195(1) and claim of retaliation under NYLL §215.  The Court grants Quartararo's motion for summary judgment on the issue of overtime compensation under both the FLSA and the NYLL, but denies the rest of plaintiffs' motion.

SO ORDERED.

Dated: Brooklyn, New York
       March 31, 2021

*Roslynn R. Mauskopf*
_____
ROSLYNN R. MAUSKOPF
United States District Judge